IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STX, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | C.A. No. 25-1359-JLH |
| STRINGKING, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT STRINGKING, INC.'S ANSWER TO THE COMPLAINT

StringKing files this Answer (including affirmative defenses and counterclaims) to the Complaint (D.I. 1). StringKing first responds to the allegations of the numbered paragraphs in the Complaint with corresponding numbered paragraphs. If any of the Complaint's headings are intended to include specific allegations against StringKing or to form a basis for liability as to StringKing, those allegations are denied.

1.      StringKing admits STX seeks relief pursuant to the Patent Act.

2.      StringKing admits the allegations of this paragraph based on STX's representation.

3.      StringKing admits the allegations in the first sentence. StringKing is without information sufficient to admit or deny the allegations of the second and third sentences and therefore denies them.

4.      Admitted.

5.      StringKing admits that it provides lacrosse equipment, including a lacrosse glove known as "Flyer l," that is available for purchase from within this District and in the United States including from Dick's Sporting Goods. Any other allegations are denied.

6.      The allegations in this paragraph are legal conclusions to which no response is required.

7.      The allegations in this paragraph are legal conclusions to which no response is required.

8.      Admitted.

9.      StringKing is without information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

10.      StringKing is without information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

11.      StringKing admits that this case involves the '930 patent and denies STX's characterization as to what this case "primarily" involves.

12.      StringKing admits that lacrosse gloves were and are made using processes of cutting and sewing. StringKing denies the remaining allegations of this paragraph, including the allegation contained in the first and second clauses of the first sentence of this paragraph.

13.      StringKing admits that lacrosse gloves were and are made using a molded portion. Given the potential ambiguity or vagueness of various terms in this paragraph (such as "markedly different," "thin zero elevation scrim," "secondary material," etc.) StringKing is without information sufficient to admit or deny the allegations of this paragraph and therefore denies them.

14.     StringKing admits that the Summary of Invention of the '930 patent contains the quoted language and that a claimed embodiment shown in Figure 2 of the '930 patent has been reproduced with added markings by STX in this paragraph. StringKing denies the remaining allegations of this paragraph if there are any.

15.     StringKing admits that the '930 patent contains the quoted language. StringKing is without information sufficient to admit or deny STX's characterization as to "substantial benefits" and therefore denies the remaining allegation of this paragraph.

16.     StringKing is without information sufficient to admit or deny the allegations in this paragraph and therefore denies them, but acknowledges that its assertions are binding admissions on STX.

17.     StringKing admits that it first sold a lacrosse glove in 2025. StringKing admits that it advertised the Flyer1 glove using the quoted phrase. StringKing denies the remaining allegations of this paragraph.

18.     StringKing admits that it promoted and documented the development of the Flyer1 glove as depicted in Exhibit C to the Complaint. StringKing denies the remaining allegations of this paragraph.

19.     Denied.

20.     The allegations in the first sentence of this paragraph are legal conclusions to which no response is required. StringKing is without information sufficient to admit or deny the allegations in the second sentence of this paragraph and therefore denies them.

21.     StringKing admits that it manufactured and sold lacrosse gloves. StringKing denies the remaining allegations of this paragraph.

22.     Denied.

23.    Denied.

24.    Denied.

STX's request for relief after ¶ 24 does not require a response, but to the extent a response is required, StringKing denies that STX is entitled to any relief.

## GENERAL DENIAL

StringKing denies every allegation of the Complaint that is neither admitted nor controverted in this Answer.

## STRINGKING'S AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

**Shorthand notations**:

"**Applicant**" refers to the person(s) or entity in whose name the relevant patent application was filed, and, as context contemplates, it may also include one or more of (1) the three individuals named as inventors on the '744 or '930 patent (Abdelmalek, Kucharsky, & McKernan), (2) personnel of Wm. T. Burnett & Co., Wm. T. Burnett IP LLC, STX LLC (or their affiliates) who were substantively involved in the preparation or prosecution of the '930 patent or related applications); or (3) counsel who filed the '311, '915, '454, or '152 applications (the "**Filing Patent Attorney**");

"**Burnett**" refers to Wm. T. Burnett IP, LLC; and

"**STX's Counsel**" refers to the counsel (including "of counsel") identified at the end of STX's Complaint.

the "**STX Products**" refers to the STX's products STX named in the Complaint, including the "the RZR, RZR2, and LZR lacrosse gloves" mentioned in ¶ 16.

## AFFIRMATIVE DEFENSES

In addition to the above responses, StringKing alleges and asserts the following defenses in response to STX's allegations, undertaking the burden of proof only as to those defenses deemed

4

affirmative defenses by law, regardless of how such defenses are denominated below. StringKing reserves the right to allege additional defenses as they become known through the course of this lawsuit. StringKing incorporates by reference all the facts recited anywhere in this Answer into each affirmative defense below.

### FIRST AFFIRMATIVE DEFENSE
### (The '930 patent is invalid.)

The '930 patent is invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, 115, 116, or 256. By way of example, the '930 patent is invalid in view of one or more of the STX Products alone or in combination with other prior art, including art cited during the prosecution of one or more applications leading to the '930 patent or in related applications. The '930 patent is also invalid for incorrect inventorship. Additional facts supporting this defense are provided in the "General Factual Allegations" and Counterclaims sections below.

### SECOND AFFIRMATIVE DEFENSE
### (The '930 patent is unenforceable.)

The '930 patent is unenforceable due to inequitable conduct committed during the prosecution of the '152 application or purported parent applications. Facts supporting this defense are provided in the "General Factual Allegations" and Counterclaims sections below.

### THIRD AFFIRMATIVE DEFENSE
### (Non-infringement)

StringKing does not infringe any valid and enforceable claim of the '930 patent. The accused StringKing product does not include one or more properly construed limitations of the claim charted in the Complaint. Additional facts supporting this defense are provided in the "General Factual Allegations" and Counterclaims sections below.

### FOURTH AFFIRMATIVE DEFENSE
**(Prosecution-History Estoppel)**

To the extent that STX's infringement allegations are based on the doctrine of equivalents, STX is barred under the doctrine of prosecution history estoppel or other limits to the doctrine of equivalents. STX is estopped from claiming that the '930 patent covers any accused StringKing product that is found to not literally infringe any valid claim of the '930 patent. Additional facts supporting this defense are provided in the "General Factual Allegations" and Counterclaims sections below.

### FIFTH AFFIRMATIVE DEFENSE
**(Failure to Comply with the Marking Requirement)**

STX is barred from receiving at least a portion of its alleged monetary damages because of its failure to comply (or to fully comply or to comply at all) with the marking requirements of 35 U.S.C. § 287, including because STX manufactured or assisted others in the manufacture of products practicing one or more claims of the '930 patent without satisfying the marking requirements of 35 U.S.C. § 287(a). Additional facts supporting this defense are provided in the "General Factual Allegations" and Counterclaims sections below.

### SIXTH AFFIRMATIVE DEFENSE
**(Equitable Defenses)**

The claims set forth in the Complaint are barred, in whole or in part, by one or more of the doctrines of waiver, estoppel (including equitable estoppel, prosecution-history estoppel, judicial estoppel), implied license, exhaustion, or unclean hands. Facts supporting this defense are provided in the "General Factual Allegations" and Counterclaims sections below.

## SEVENTH AFFIRMATIVE DEFENSE
### (Adequate Remedy at Law)

Without admitting that STX's Complaint states any claim on which relief may be granted, STX is not entitled to seek equitable relief at least because the alleged injury/injuries suffered by STX, if any, would be adequately compensated by damages, thereby affording complete and adequate remedies at law. Moreover, on information and belief, the '930 patent is owned by Burnett, who does not offer any products or services covered by the '930 patent, militating against, if not precluding, injunctive relief. Additional facts supporting this defense are provided in the "General Factual Allegations" and Counterclaims sections below.

## EIGHTH AFFIRMATIVE DEFENSE
### (Unavailability of Lost Profits as a Damages Remedy)

On information and belief, the '930 patent is owned by Wm. T. Burnett, IP, LLC, which does not make, sell, or offer for sale any products or services covered by the '930 patent, thereby precluding STX from seeking lost profits as a measure of damages because it does not own the '930 patent and, based on information and belief, has not received sufficient rights from Burnett to maintain this suit on its own and receive lost profits. Additional facts supporting this defense are provided in the "General Factual Allegations" below.

## NINTH AFFIRMATIVE DEFENSE
### (No enhanced Damages / Lack of Willful Infringement)

StringKing has not willfully infringed the '930 patent. STX may not properly recover enhanced damages, including damages under 35 U.S.C. § 284. Among other deficiencies, STX did not provide pre-suit notice of infringement to StringKing. StringKing has not deliberately or intentionally infringed any valid and enforceable claim of the '930 patent. StringKing has not acted in a willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or manner

characteristic of a pirate as set forth in, for example, *SRI Int'l, Inc. v. Cisco Sys*., Inc., 14 F.4th 1323, 1330 (Fed. Cir. 2021).

## TENTH AFFIRMATIVE DEFENSE
### (Non-Liability Due to False marking)

STX's claims are barred, in whole or in part, because of falsely marking one or more STX Products. That false marking has caused or threatens to cause competitive injury to StringKing, including loss of sales, loss of goodwill, or market-entry impediments arising from STX's or Burnett's misleading representation that the STX Products are properly covered by a valid patent when they are not. Any claim for damages is barred or reduced by such false marking. This defense is pleaded in the alternative. If the STX Products have been correctly marked such that they fall within the scope of the '930 patent, then that establishes one or more invalidity bases as explained herein. Additional facts supporting this defense are provided in the "General Factual Allegations" and Counterclaims sections below.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

STX's Complaint fails to state a claim upon which relief may be granted. For example, subject-matter jurisdiction is lacking because of the failure to include the purported conceded patent owner (Burnett) in this suit. Additionally, STX has vaguely alleged infringement of "one or more of the claims of the '930 patent" with no factual assertions regarding any claim other than claim 1. Thus, the Complaint fails to articulate any facts by which a claim for relief, including of infringement of any other claim of the '930 patent could plausibly be found. Additional facts supporting this defense are provided in the "General Factual Allegations" and Counterclaims sections below.

## TWELFTH AFFIRMATIVE DEFENSE
### (Exceptional Case Under 35 U.S.C. § 285)

This case should be found "exceptional" under 35 U.S.C. § 285 and StringKing should be awarded its fees incurred to date in having to respond to STX's Complaint and for fees incurred going forward in this suit. No bad faith, misconduct, or sanctionable activity is required for an exceptional-case finding. The inquiry is not similar to a Rule 11 analysis (although StringKing reserves its rights to seek additional remedies under, for example, Rule 11). Under 35 U.S.C. § 285, an exceptional case is simply one that stands out from others with respect to the substantive strength of a party's litigating position or the unreasonable manner in which the case was litigated.

Here, several bases support an exceptional-case finding and StringKing expects more to become available as this case proceeds. STX failed to perform an adequate pre-suit investigation before bringing this action. Alternatively or additionally, STX's counsel of record as of the filing of this Answer (STX's Counsel) did not conduct a reasonable pre-suit investigation as required by, for example, the Federal Rules of Civil Procedure and leading to an exceptional-case finding under 35 U.S.C. § 285. For example, STX's Counsel (a) did not adequately review the '930 patent; (b) did not adequately review the applications in that purport to serve as a basis for priority for the '930 patent; (c) did not adequately review the prosecution histories of those applications; (d) failed to learn that the Patent Office stated that claim 1 of the '152 application was not entitled to an earlier filing date than its actual filing date; (e) failed to adequately review whether inventorship was correct on the '930 patent and parent applications; (f) failed to determine the correct filing date that each claim of the '930 patent is entitled to; (g) failed to determine who the proper inventors on the '930 patent and '454 application should be; (h) failed to evaluate the merit of Applicant's priority claims and the propriety of their characterizations; (i) failed to determine if Applicant added new matter in the '454 application at the time it was filed compared to the '930

patent; (j) failed to determine whether every STX Product falls within the scope of any claim of the '930 patent; (k) failed to determine whether STX was justified in marking the STX Products with the '930 patent's number; (l) failed to determine that if STX was justified in asserting that the STX Products were covered by the '930 patent then reconciling why STX did disclose information about the STX Products during prosecution of the '152 application given the PTO's filing-date determination. STX's litigating position is exceedingly weak; or (m) failed to review the relevant STX/Burnett agreement to determine if STX could properly bring or maintain this suit without Burnett. Any belief that the '930 patent is valid or enforceable is weak, lacking a basis in law or fact.

Continuing this case is an additional basis for an exceptional-case finding, particularly in view of the express notices contained in this Answer. STX maintains and admits that its products, including one or more of its "RZR, RZR2, and LZR lacrosse gloves" fall within the scope of the '930 patent. *See* Complaint at ¶ 16 (referring to those products being "covered by these patents," with reference to the '930 patent and the '744 patent). Plus, STX further maintains and admits that those STX Products are covered by the '930 patent by marking those products as so covered. *See* Complaint at ¶ 20. Even so, neither STX nor Burnett (including their representatives) disclosed to the Patent Office material information about those products during the prosecution of the '152 application, such as pre-dating sales, offers for sale, and public-disclosure information even though the Patent Office expressly stated that the "effective filing date of claim 1 and its dependent claims is 2/25/22 as claim 1 recites a bevel angle." Alternatively or additionally, STX or Burnett improperly marked products that it knew were not covered by a valid patent.

StringKing reserves the right to found a request for an exceptional-case finding on additional bases if they materialize (such as STX taking new claim-construction positions that

depart from those taken during prosecution, asserting divergent claim-construction positions regarding infringement assertions on the one hand and prosecution or invalidity-preservation positions on the other hand or improperly attempting to mitigate the effect of or fix issues such as wrong inventorship in a manner that is improper and not forthright, such as when Applicant tried unsuccessfully to alter its unfounded characterization of the '454 application as a continuation application and then abandoned it, filed a new one, and there (the '152 application), without disclosing prior context or the Patent Office's prior refusal to permit the '454 application's change-in-continuation status, Applicant—in the new '152 application—mischaracterized the '454 application as a CIP.

When "there is an exclusive license agreement . . . but the exclusive license does not transfer enough rights to make the licensee the patent owner, either the licensee or the licensor may sue, *but both of them generally must be joined as parties to the litigation*." *Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010) (emphasis added). Rather than conserve the Court's and StringKing's resources, STX has refused to provide the Court or StringKing with a copy of the licensing agreement despite StringKing requesting it on October 31, 2025

Though not necessary for an exceptional-case finding, on information and belief, STX has brought this suit in bad faith (e.g., given the bases for invalidity and unenforceability) and for an improper purpose (such as to quell proper competition in the market). In brief, STX's validity, enforceability, damages, and standing positions are all substantively weak. STX is litigating this case in an unreasonable manner. STX insists on pressing this litigation and forcing StringKing and the Court to address STX's unfounded claims. For at least these, and additional facts set forth in the "General Factual Allegations" and Counterclaims sections below, this case stands out from

others in the context of 35 U.S.C. § 285 and StringKing should accordingly be awarded its fees. The facial inconsistencies and irregulates, among others, demonstrate that STX's Counsel failed to undertake the objectively reasonable inquiry required by Rule 11 and multiplied proceedings unreasonably and vexatiously within the meaning of 28 U.S.C. § 1927.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Lack of Standing)

On information and belief, the patent owner must be or should be joined as an additional or necessary party. Although STX characterizes itself as an exclusive license, the standard for determining whether a case can proceed without joining the patent owner turns on the extent of rights conveyed and retained by the patent owner. On information and belief, the patent owner has not conveyed sufficient rights to STX for STX to maintain this suit by itself.

## STRINGKING'S COUNTERCLAIMS

StringKing files these Counterclaims and alleges as set forth below. Declaratory-judgment relief is sought under 28 U.S.C. §§ 2201–2202 *et. seq.* StringKing files these Counterclaims and makes its allegations based on information and belief and the information currently available to and as understood by StringKing. Nothing herein is intended to be regarded as an affirmative admission or concession by StringKing regarding the asserted patent (or other related patents) such as who owns it, that ownership is proper, that the patent is valid, that the patent is enforceable, etc. Any such wording is used for readability and to avoid lengthy qualifications. Some facts are referenced based on STX's representation in its Complaint, which bind STX but not StringKing.

Some facts listed below are grouped under headings, generally or relating to counts or theories. Although sets of facts are grouped or under select headings, those headings are not limiting; other facts are relevant; and facts under certain headings are relevant to other counts or theories. Headings are provided only to help with readability and understanding. In accordance

with F.R.C.P. Rule 10(c), StringKing incorporates by reference all the facts recited anywhere in this Answer into each count below.

### General Factual Allegations Common to All Counts

### (Facts Generally Related to the Asserted Patent)

1.  U.S. App. No. 61/930,311 ("the '311 application" / "the '311 provisional") was filed on 01/22/2014. Its "Application Data Sheet names only Anthony Abdelmalek as an inventor. It is entitled "STITCHLESS DORSAL PADDING FOR PROTECTIVE SPORTS GLOVES AND OTHER PROTECTIVE GEAR."

2.  U.S. App. No. 14/602,915 ("the '915 application") was filed on 01/22/2015. It names only Anthony Abdelmalek as a named inventor. Entitled "STITCHLESS DORSAL PADDING FOR PROTECTIVE SPORTS GLOVES AND OTHER PROTECTIVE GEAR," it matured into U.S. Pat. No. 10,201,744 (the '744 patent).

3.  U.S. App. No. 16/241,454 ("the '454 application") was filed on 01/07/2019 as a "continuation" application of the '915 application It is entitled "STITCHLESS DORSAL PADDING FOR PROTECTIVE SPORTS GLOVES AND OTHER PROTECTIVE GEAR." It names three inventors: Anthony Abdelmalek ("Abdelmalek"), David Kucharsky ("Kucharsky"), and Patrick McKernan ("McKernan").

4.  U.S. App. No. 17/681,152 ("the '152 application) was filed on 02/25/2022. It is entitled "STITCHLESS DORSAL PADDING FOR PROTECTIVE SPORTS GLOVES AND OTHER PROTECTIVE GEAR." It names only Kucharsky and McKernan as inventors. It matured into U.S. Pat. No. 12,274,930 ("the '930 patent"). It was filed as a "continuation-in-part" ("CIP") of the '454 application

5.  U.S. App. No. 19/036,972 (the '972 App) was filed on 01/24/2025. It is entitled "STITCHLESS DORSAL PADDING FOR PROTECTIVE SPORTS GLOVES AND OTHER

PROTECTIVE GEAR." It names only Kucharsky and McKernan as inventors. It was pending as an application as of October 2025. It was filed as a continuation of the '152 application. It characterizes the '454 application as a continuation-in-part application.

6.      Table I, below, summarizes select information about the patents referenced above.

| Table I | | |
|---|---|---|
| **Application/Patent** | **Inventor(s)** | **Relationship When Filed** |
| The '311 application | Abdelmalek | Provisional |
| The '915 application (which becomes the '744 patent) | Abdelmalek | Nonprovisional of the '311 application |
| The '454 application | Abdelmalek, Kucharsky, McKernan | Continuation of the '915 application |
| The '152 application (which becomes the '930 patent, the patent-in-suit) | Kucharsky, McKernan | CIP of the '454 application |
| The '972 application | Kucharsky, McKernan | Continuation of the '152 application |

7.      Diagram D1, below, summarizes provides a family-tree diagram of the various patents and applications based on Applicant's initial characterization of the '454 application.

14



**Diagram D1**

**(Facts Generally Related to Inventorship)**

8.     Exhibit 1 is a fair and accurate portion of Anthony Abdelmalek's LinkedIn® profile as of 10/26/2025. *See also*, https://www.linkedin.com/in/anthony-a-9842207/details/experience (visited 10/26/2025). Exhibit 1 indicates that Abdelmalek was an STX employee from June 2010 – June 2015.

9.     On information and belief, Abdelmalek was an STX employee only from June 2010 – June 2015.

10.     Exhibit 2 is a fair and accurate portion of David Kucharsky's LinkedIn® profile as of 10/26/2025. *See also*, https://www.linkedin.com/in/dave-kucharsky/details/experience

(visited 10/26/2025). Exhibit 2 shows that Kucharsky was an STX employee from December

2012 – present.

11.    On information and belief, Kucharsky became an STX employee in December

2012 and remains one to this day (November 2025).

12.    Exhibit 3 is a fair and accurate portion of Patrick McKernan LinkedIn® profile as

of 10/26/2025. *See also,* https://www.linkedin.com/in/patrick-mckernan-510b3a3a (visited

10/26/25). Exhibit 3 shows that McKernan was an STX employee only from December 2016 –

May 2022.

13.    On information and belief, McKernan was an STX employee only from

December 2010 – May 2015.

14.    The '930 patent names only Kucharsky and McKernan as inventors. Abdelmalek

is not included.

15.    Abdelmalek was the sole named inventor on the '311 application, the '915

application, and the '744 patent.

16.    On information and belief, Abdelmalek executed an inventor declaration in

connection with the '915 application. That declaration states that he believed himself to be "the

original inventor or an original joint inventor of a claimed invention in the" '915 application.

Applicant filed that declaration with the Patent Office as part of the prosecution of the '915

application on 02/24/2015.

17.    McKernan was not an STX or Burnett employee when the '311 provisional

application filed (on 01/22/2014).

18.    McKernan was not an STX or Burnett employee when the '915 application was

filed (on 01/22/2015).

19.    McKernan did not join STX until on or about December 2016.

20.    On information and belief, McKernan did not contribute to the conception of the subject matter disclosed or claimed in the '744 patent, the '915 application, or the '311 application

21.    Claim 1 of the '744 patent recites: "1. A protective sports glove, comprising: a hand portion configured when worn by a user for covering the user's hand inclusive of fingers, thumb and carpometacarpal joints and configured when worn by said user to extend down at least to a wrist crease of said user's hand, said hand portion including a palmar side, a dorsal side, a first layer of scrim material and finger gussets; and a dorsal panel consisting solely of a second layer of molded foam fused to said scrim material and covering the dorsal side of said hand portion, said dorsal panel being molded to define a zero-elevation surface, a plurality of shock absorbing resilient cushions raised from said zero-elevation surface, and interstitial channels between each said shock-absorbing cushion, at least two of said plurality of shock absorbing cushions positioned when worn by said user adjacent said user's carpometacarpal joint and separated by an interstitial channel having a width of 1 mm or less; wherein the dorsal panel covering said fingers comprises a substantially contiguous border framing the dorsal panel and having a width within a range of from 4-8 mm, said border being positioned within and attached to said finger gussets."

22.    Claims 2-15 of the '744 patent purport to recite further features beyond those of claim 1 of the '744 patent.

23.    Claim 1 of the '930 patent recites "1. A protective sports glove having a palmar section configured for covering a wearer's palm, the protective sports glove comprising: a unitary dorsal panel configured to attach to the palmar section and cover the back of said wearer's hand

including at least four fingers, the dorsal panel consisting of an integrally-molded elastomeric member formed with a main section and adjacent finger sections sharing a common zero-elevation surface and a patterned array of foam protective pads each defining an individual island raised from said zero-elevation surface, said patterned array of foam protective pads including a plurality of foam protective pads extending along each finger section, the foam protective pads within each finger section being aligned end-to-end and separated from adjacent foam protective pads by interstitial channels having a width within a range of from 1-4 mm, and a border flange circumscribing said finger sections of said dorsal panel, said border flange protruding outward from said zero-elevation surface around said finger sections, and protruding outward at an acute bevel angle relative to said zero-elevation surface around at least four of said adjacent finger sections."

24.    Claims 2-19 purport to recite further features beyond those claim 1 of the '930 patent.

25.    On information and belief, STX believes that one feature that makes the back-of-hand portion claimed in the '930 patent markedly different from cut-and-sew gloves preceding "'930 gloves" is a unitary molded part (Complaint, ¶ 13), which is referenced in the '930 patent as a "unitary" dorsal panel.

26.    The '930 patent states: "What is needed is a protective sports glove and 'unitary' dorsal panel for the same that allow for a tightly-packed pad array, yet still provides improved flexibility, increased protection, finer tactile feel, and greater economy of manufacture." '930 patent at ¶ 6.

27.    The '744 patent states: "What is needed is a protective sports glove and 'unitary' dorsal panel for the same that allow for a tightly-packed pad array, yet still provides improved

18

flexibility, increased protection, finer tactile feel, and greater economy of manufacture." '744 patent at ¶ 7.

28.     Every claim of the '930 patent recites a "protective sports glove" that includes "a unitary dorsal panel."

29.     If the inventor declaration that Abdelmalek signed is correct, then he contributed to the conception of at least some subject matter claimed in the '930 patent.

30.     On information and belief, Abdelmalek was not presented with an opportunity to indicate whether he believed that he had contributed to the conception of at least some of the subject matter claimed in the '930 patent.

31.     On information and belief, Abdelmalek was not presented with an opportunity to indicate whether he thought he should be a named inventor on the '152 application or the '930 patent.

32.     On information and belief, Abdelmalek should have been a named inventor on the '930 patent. He should have been so named if he contributed, at any time, to the subject matter claimed in the '152 application, including when it issued as the '930 patent.

33.     On information and belief, at least one of Kucharsky or McKernan should not be a named inventor on the '930 patent.

34.     The claims of the '930 patent are directed to a "protective sports glove." The claims of the '744 patent are directed to a "protective sports glove." At the time of filing the '454 application, claim 1 was directed to a "protective sports glove."

35.     Alternatively or additionally, if Abdelmalek was properly not a named inventor on and when the '152 application was filed or on and when the '930 patent issued, then he should not have been named as an inventor on and when the '454 application was filed.

36.     The same Filing Patent Attorney represented inventorship to the Patent Office at the filing of the '311, '915, '454, and '152 applications.

37.     The naming of the inventors that were named on each of the '311, '915, '454, and '152 applications was intentional.

38.     Abdelmalek was intentionally not named as an inventor on the '152 application and the '930 patent.

39.     Kucharsky and McKernan were intentionally named as the only inventors on the '152 application and the '930 patent.

40.     Abdelmalek, Kucharsky, and McKernan were intentionally named as the inventors on the '454 application.

41.     On information and belief, Burnett or STX did not want Abdelmalek to be a named inventor on the '930 patent.

42.     On information and belief, Burnett or STX regarded the technology disclosed or claimed in the '930 patent as innovative, as a market-distinguishing factor, or otherwise beneficial to STX or Burnett.

43.     On information and belief, by the time the '454 application was filed (01/07/2019), Abdelmalek had since left STX (on or about June 2015).

44.     The Filing Patent Attorney who filed the '152 application is the same counsel of record who filed and prosecuted the '311 application, the '915 application, and the '454 application.

45.     The face of the '930 patent does not name Abdelmalek as an inventor.

46.     The face of '930 patent does not reveal that Abdelmalek contributed to the conception of any subject matter claimed in the '930 patent.

47.     During prosecution of the '454 application, in an Office Action of 05/04/21, the Patent Office informed Applicant that "This application currently names joint inventors. In considering patentability of the claims the examiner presumes that the subject matter of the various claims was commonly owned as of the effective filing date of the claimed invention(s) absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and effective filing dates of each claim that was not commonly owned as of the effective filing date of the later invention in order for the examiner to consider the applicability of 35 U.S.C. 102(b)(2)(C) for any potential 35 U.S.C. 102(a)(2) prior art against the later invention."

48.     Despite that notice, Applicant did not point out the inventors and effective filing dates of each claim that was not commonly owned as of the effective filing date of any such later invention. On information and belief, Abdelmalek first executed an assignment purporting to assign his patent rights on 01/10/2019, which occurred after the '454 application's 01/07/2019 filing date. *See* Exhibit 4. Before 01/10/19, Abdelmalek had not assigned his patent rights to anyone. For example, a document filed with the Patent Office on 01/22/2015 during prosecution of the '915 application states that Abdelmalek, as to any concern or organization to which Abdelmalek had assigned or was obligated to assign his patent rights, there was "no such person, concern, or organization."

**(Facts Generally Related to Mischaracterizations of the '454 application)**

49.     If the '454 App would have been filed as a CIP, then the Patent Office, absent evidence to the contrary, would have accorded the claims an effective filing date equal to that of the actual filing date of the '454 application (01/07/2019). This would have resulted in the Application not being able to exclude approximately four years' worth of prior art in view of the '311 provisional application having a filing date of 01/22/2014.

50.    Registered patent attorneys are familiar with the difference between a continuation application and a continuation-in-part application.

51.    The annotated screenshot below shows that the '454 application was characterized as a "continuation" application in the specification.



**STITCHLESS DORSAL PADDING FOR PROTECTIVE SPORTS GLOVES AND OTHER PROTECTIVE GEAR**

CROSS-REFERENCE TO RELATED APPLICATION(S)

[0001]  The present application is a continuation of application serial no. 14/602,915 filed January 22, 2015, which in turn derives priority from U.S. provisional patent application no. 61/930,311 filed Jan. 22, 2014.

**Excerpt E1** (From Exhibit 5, annotated)

52.    The annotated screenshot below shows that the '454 application's "Application Data Sheet" (filed on the same day) likewise characterizes it as a "Continuation" application.



**Domestic Benefit/National Stage Information:**

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, 365(c), or 386(c) or indicate National Stage entry from a PCT application. Providing benefit claim information in the Application Data Sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.
When referring to the current application, please leave the "Application Number" field blank.

| Prior Application Status | Pending | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| | Continuation of | 14602915 | 2015-01-22 |

**Excerpt E2** (From Exhibit 6 at p. 3, annotated)

53.    During prosecution of the '454 application, Applicant conceded that new matter was added as compared to the '744 patent. Applicant stated: "Applicant concedes that the slits or

sloping top surface of the border flange of claims 21 and 22 are not shown in the '744 reference." (As confirmed by the screenshot below.)

> Applicant concedes that the slits or sloping top surface of the border flange of claims 21 and 22 are not shown in the '744 reference. The Examiner credits Berlese with a border flange

**Excerpt E3** (From Exhibit 7 at p. 9, annotated)

54.    By characterizing the '454 as a continuation, Applicant stood to reap the benefits of arguing that it was entitled to the earlier filing dates without regard to new matter.

55.    Characterizing the '454 application as a continuation would indicate to the Patent Office that Applicant did not believe that any new matter had been added to the '454 application as compared to the '930 patent.

56.    During prosecution of the '454 application, Applicant tried to rely on a claimed "border flange" element. The Patent Office cited "Leary" against the Applicant. Applicant then tried to disqualify Leary by relying on the earlier priority date of the '915 application, as reflected below (page-break area removed).

> of Leary '173. The Examiner credits Leary with a border flange of approximately 8 mm and the "approximately" term modifying 8mm to include those values just less than 8 mm, e.g., "*one of ordinary skill could have arrived at the 5-6 mm range through routine experimentation.*"
>
> Applicant disagrees. However, priority application serial no. 14/602,915 filed prior to Leary unequivocally describes a "border surrounding dorsal panel is within a range of from 4-8 mm across." Leary is not proper prior art.

**Excerpt E4** (From Exhibit 7 at pp. 14-15, annotated)

57.    At the time Applicant made the statements above, Applicant knew that the '915 application did not disclose a border flange.

58.    Applicant intended to deceive the patent office by making the statements above. Applicant knew that there was no disclosure of a border flange in the '915 application.

59.    Had the '454 application been properly characterized as a CIP and acknowledged that the "border flange" was new matter, Applicant would not have been able to cite to an earlier-filed application to support the border-flange argument that it made.

60.    Applicant added new matter to the '454 application, including disclosure related to slits, v-notches, a border flange, and other items mentioned in the image-file wrapper of the '454 application.

61.    The Patent Office identified what it characterized as new matter in the '454 application. Applicant could not overcome the Patent Office's rejections related to new matter. Applicant's arguments were rejected, including its failed arguments to attempt to undo its mischaracterization. Ultimately, Applicant abandoned the '454 application. It filed another application, the '152 application, which led to the '930 patent.

62.    If applicant could have properly corrected its erroneous mischaracterization of the '454 application as a CIP application, it would have done so during prosecution of the '454 application.

**(Facts Generally Related to the False Marking)**

63.    STX's Complaint admits that "At the time the '930 patent issued, STX updated its RZR glove website page with the patent number to give notice of its back of hand glove invention." ECF 1 at ¶ 20 (citing its Exhibit D). That admission is binding on STX.

64.    When STX updated its website as indicated, STX knew that the '930 patent was unenforceable for the reasons set forth in detail herein (including above, and in the Counts

below). STX likewise knew that the '930 patent was invalid for the reasons set forth herein. Despite knowing that the '930 patent was invalid or unenforceable, based on STX's admission, it still updated its website as described, doing so with an intent to deceive the public by indicating that one or more of the STX Products were covered by a patent known to be invalid, unenforceable, or both.

65.     On information and belief, STX has marked or attempted to mark its products in other ways, such as on product packaging, marketing materials, in communications with suppliers or customers, and the like, in this District and in the U.S.

66.     STX admits that StringKing's "Flyer 1" is "in competition with the enumerated STX lacrosse gloves." ECF 1 at ¶ 19.

67.     On information and belief, STX marked its STX Products to help distinguish those products in the market and to help convey them as new, novel, or otherwise having beneficial features that merit patent protection.

68.     On information and belief: STX's false marking has diverted customers, sales, or both from StringKing; STX has referenced the '930 patent when interacting with retailers; and retailers have factored STX's purported patent coverage into whether to stock or offer StringKing's products for sale based on STX's false marking—all causing competitive harm to StringKing.

69.     On information and belief, at least one retailer has opted to not offer at least one of StringKing's products because of STX's false marking of its products, also causing competitive harm to StringKing. For example, at least one retailer avoided offering StringKing's products for fear that STX might make an infringement allegation against them. Alternatively or additionally, the retailer viewed the STX Products as more innovative than StringKing's

products because STX represented that its products were covered by the '930 patent (which it knew to be invalid or unenforceable) and thus chose to promote the STX Products instead of or more than StringKing's products, causing competitive harm to StringKing.

70.     On information and belief, at least one product reviewer, influencer, or promoter has mentioned STX's patent coverage, which is false, and that false marking has caused at least one customer to choose an STX Product over a StringKing product, causing competitive harm to StringKing.

**(Facts Generally Related to Lack of Pre-suit Investigation and Bad-Faith Litigation)**

71.     STX initially filed its complaint in the District Court of Maryland. *See STX, LLC v. StringKing, Inc*., case no 1:25-cv-03191-ELH at ECF No. 1 (the "Maryland Complaint").

72.     StringKing does not have a regular and established place of business in Maryland.

73.     The Maryland Complaint stated that "Venue properly lies in this district under 28 U.S.C. § 1400(b) because StringKing is subject to personal jurisdiction in this District." Maryland Complaint at ¶ 8.

74.     Counsel for StringKing had requested an extension of the November 10, 2025 deadline to respond to the Maryland Complaint. StringKing's bases were that patent counsel had been only recently retained and had a prearranged trip outside of the U.S. from October 15-27, 2025. Counsel for STX denied that request.

75.     During a telephone conference of October 31, 2025, counsel for StringKing requested that counsel for STX provide its venue bases. Counsel for STX responded that he was comfortable with venue.

76.     With no notice, STX voluntarily dismissed the Maryland Action on November 6, 2025 and provided notice to StringKing's counsel on Friday, November 7, 2025, one business day before StringKing's Answer was due.

77.    On information and belief, counsel for STX knew that venue was not proper in Maryland at the time of filing the Maryland Complaint.

78.    On information and belief, counsel for STX knew that venue was not proper on October 31, 2025.

79.    On information and belief, counsel for STX intentionally waited until November 6, 2025 to dismiss the Maryland Complaint and avoided informing StringKing of its to dismiss the Maryland Complaint until November 7, 2025. STX knew that StringKing was expending resources to meet its November 10, 2025 filing deadline.

80.    Alternatively or additionally, STX was unaware of the venue requirements that apply to patent cases as set forth in 28 U.S.C. § 1400(b) despite citing that statutory provision in the Maryland Complaint. STX failed to properly determine whether it had a good-faith basis to bring the Maryland Action in Maryland. After counsel for StringKing asked about venue during a teleconference of October 31, 2025, STX reevaluated its position.

81.    The image file wrapper of the '311 application is 46 pages, of the '915 application is 288 pages, of the '454 application is 334 pages, and the '152 application is 403 pages. The total number of pages of those four image file wrappers is 1071 pages.

82.    On information and belief, before filing the Complaint, STX's Counsel had not reviewed the image file wrappers of the '311 application, the '915 application, the '454 application, and the '152 application.

83.    On information and belief, before filing the Complaint, STX's Counsel had not reviewed the art cited in the image file wrappers of the '311 application, the '915 application, the '454 application, and the '152 application.

84.     On information and belief, before filing the Complaint, STX's Counsel had not reviewed the '930 and '744 patents.

85.     On information and belief, before filing the Complaint, STX's Counsel had not investigated whether inventorship of the '930 patent was correct and had not made a determination of who should be properly named as inventors.

86.     On information and belief, before filing the Complaint, STX's Counsel had not investigated whether inventorship of the '454 application was correct and had not made a determination of who should be properly named as inventors.

87.     On information and belief, before filing the Complaint, STX's Counsel had not investigated whether inventorship of the '744 patent was correct and had not made a determination of who should be properly named as inventors.

88.     On information and belief, before filing the Complaint, STX's Counsel was unaware that the Patent Office made the following statement during the prosecution of the '152 application: "The effective filing date of claim 1 and its dependent claims is 2/25/22 as claim 1 recites a bevel angle."

89.     Alternatively or additionally, before filing the Complaint, STX's Counsel was aware that the Patent Office made the following statement during the prosecution of the '152 application: "The effective filing date of claim 1 and its dependent claims is 2/25/22 as claim 1 recites a bevel angle."

90.     On information and belief, before filing the Complaint, STX's Counsel had not investigated what priority date each claim of the '930 patent was entitled to.

91.     On information and belief, before filing the Complaint, STX's Counsel had not investigated what priority date claim 1 of the '930 patent was entitled to.

92.     Alternatively or additionally, before filing the Complaint, STX's Counsel knew that claim 1 of the '930 patent was not entitled to an earlier effective filing date before February 25, 2022, its filing date.

93.     On information and belief, before filing the Complaint, STX's Counsel was unaware that the '454 application was originally filed and characterized as a continuation application by the Applicant.

94.     Alternatively or additionally, before filing the Complaint, STX's Counsel knew that Applicant characterized the '454 application as a continuation application when it was filed even though the filename of the specification that Applicant filed was "CIP.pdf."

95.     On information and belief, before filing the Complaint, STX's Counsel had not evaluated the merits of Applicant's priority claims and priority characterizations in the '152 and '454 applications.

96.     On information and belief, before filing the Complaint, STX's Counsel did not know that Applicant had added new matter in the '454 application compared to the '744 patent and, despite doing so, characterized the '454 application as a continuation of the '915 application.

97.     On information and belief, before filing the Complaint, STX's Counsel failed to determine whether the STX Products fell within the scope of at least one claim of the '744 patent.

98.     On information and belief, before filing the Complaint, STX's Counsel failed to determine whether the STX Products fell within the scope of at least one claim of the '930 patent.

99.     On information and belief, before filing the Complaint, STX's Counsel failed to determine whether the STX Products were properly marked as being covered by the '930 patent.

100.    On information and belief, before filing the Complaint, STX's Counsel failed to determine whether STX's "RZR" glove includes all the features of claim 1 of the '930 patent.

101.    On information and belief, before filing the Complaint, STX's Counsel failed to determine whether STX's "RZR" glove should be properly marked as being covered by '930 patent.

102.    On information and belief, before filing the Complaint, STX's Counsel believed that STX's "RZR" glove falls within the scope of claim 1 of the '930 patent.

103.    On information and belief, before filing the Complaint, STX's Counsel failed to conduct a pre-suit investigation sufficient for STX's Counsel to believe that the claims of the '930 patent were valid and enforceable.

104.    On information and belief, before filing the Complaint, STX's Counsel was unaware that STX's "RZR" glove falls within the scope of claim 1 of the '930 patent, that the "RZR" glove had been on sale, sold, and publicly disclosed before February 25, 2021, and that the patent office had determined that claim 1 of the '930 patent was entitled to a priority date only of February 25, 2022.

105.    Alternatively or additionally, before filing the Complaint, STX's Counsel was aware that STX's "RZR" glove falls within the scope of claim 1 of the '930 patent, that the "RZR" glove had been on sale, sold, and publicly disclosed before February 25, 2021, and that the patent office had determined that claim 1 of the '930 patent was entitled to a priority date only of February 25, 2022.

106.    On information and belief, before filing the Complaint, STX's Counsel had not reviewed the agreement between STX and Burnett to determine whether STX had standing to bring this action alone.

## COUNT I – DECLARATORY JUDGMENT OF INVALIDITY

107.    StringKing incorporates by reference all facts recited in this Answer.

108.    The '930 patent is invalid.

109.    The '930 patent is invalid under one or more of 35 U.S.C. §§ 101, 102, 103, 112, 115, 116, or 256. The '930 patent is invalid for failing to comply with one or more provisions of Section 101, including, for example, its "new and useful" or "new and useful improvement" provisions. The '930 patent is invalid under Section 102 for want of novelty in view of prior. The '930 patent is invalid under Section 103 because it is obvious in view of one or more prior-art references. The '930 patent is invalid for failing to comply with the written-description or enablement requirement or other provision of Section 112. The '930 patent is invalid for improper inventorship.

### (Invalidity Due to Prior Art)

110.    The '930 patent is invalid under 35 U.S.C. §§ 102 or 103.

111.    Selling or offering for sale an embodiment of a claimed invention before the effective filing date of the claimed invention can invalidate the purported patent covering the embodiment. *See, e.g., STX, LLC v. Brine, Inc*., 211 F.3d 588, 590 (Fed. Cir. 2000) (finding an STX patent invalid in view of a sufficiently early commercial offer for sale).

112.    One or more STX Products mentioned in the Complaint, such as in ¶ 16, (or other STX/Burnett products) are prior art against the '930 patent. Those STX Products, alone or in combination with other prior art, render the '930 patent invalid.

31

113.    Paragraph 16 of the Complaint states: "16. Since the issuance of the '930 patent in 2025, further improving the innovation of the parent patent 10,201,744 issued in 2015, while still relying on the parent specification, STX has manufactured and sold with great acceptance various products with the back of hand features covered by these patents. These products include the RZR, RZR2, and LZR lacrosse gloves, each with a version of the inventive back of hand."

114.    Screenshot S1, below, is a screenshot of a portion of STX's website from September 28, 2020, which shows a version of the "RZR" glove mentioned in the Complaint.



**Screenshot** (From Exhibit 11)

115.    Exhibit 11 is a fair and accurate copy of a portion of STX's website as of September 28, 2020 as provided by the WayBack Machine.[1]

116.    Exhibit 11 shows that STX's "RZR" glove was available for purchase and offered for sale as of September 28, 2020.

117.    On information and belief, STX's "RZR" glove falls within the scope of claim 1 (e.g., includes every limitation of claim 1) of the '930 patent.

118.    Consistent with ¶ 16 of the complaint, STX's "RZR" glove is "covered by" the '930 patent. *See* ECF 1 at ¶ 16.

119.    Exhibit 11 shows that STX's "RZR" glove was publicly disclosed in the U.S. at least as of September 28, 2020.

120.    The earliest priority date that claim 1 of the '930 patent is entitled to is February 25, 2022 (the filing date of the '152 application).

121.    At least because claim 1 of the '930 patent recites "an acute bevel angle," which is not disclosed in any prior application, the '930 patent is not entitled to an earlier priority date than February 25, 2022.

122.    During prosecution of the '152 application, in an Office Action of 03/28/2024, the Patent Office found that the effective filing date of claim 1 is 2/25/22. *See* Exhibit 8 at p. 6 (green highlight).

123.    Exhibit 12 includes true and accurate copies of pictures of an actual and illustrative STX "RZR" glove that was sold, offered for sale, and publicly disclosed before 02/25/2021.

---

[1] https://web.archive.org/web/20200928123023/https://www.stx.com/surgeon-rzr-gloves) (visited 11/12/2025)

124.     Exhibit 13 adopts STX's claim references and mappings from STX's Complaint Ex. B (ECF 1-2) and applies them to STX's "RZR" glove (as shown in Ex. 12 and from Ex. 11).

125.     Because STX's "RZR" glove was publicly disclosed, sold, or offered for sale in the U.S. more than one year before February 25, 2022 (the earliest priority date that claim 1 of the '930 patent is entitled to) and because STX's "RZR" glove falls within the scope of claim 1, at least claim 1 is invalid under, for example, 35 U.S.C. § 102.

126.     STX's "RZR" lacrosse glove (as referenced in the Complaint at, for example ¶ 16) falls within the scope of claims 16, 17, and 19 of the '930 patent.

127.     STX's "RZR2" lacrosse glove (as referenced in the Complaint at, for example ¶ 16) falls within the scope of at least claim 1 of the '930 patent.

128.     STX's "RZR2" lacrosse glove (as referenced in the Complaint at, for example ¶ 16) falls within the scope of claims 16, 17, and 19 of the '930 patent.

129.     STX's "LZR" lacrosse glove (as referenced in the Complaint at, for example ¶ 16) falls within the scope of at least claim 1 of the '930 patent.

130.     STX's "LZR" lacrosse glove (as referenced in the Complaint at, for example ¶ 16) falls within the scope of claims 16, 17, and 19 of the '930 patent.

131.     STX's "RZR" lacrosse glove (as referenced in the Complaint at, for example ¶ 16) was on sale before February 25, 2022).

132.     STX's "RZR2" lacrosse glove (as referenced in the Complaint at, for example ¶ 16) was on sale before February 25, 2022).

133.     STX's "LZR" lacrosse glove (as referenced in the Complaint at, for example ¶ 16) was on sale before February 25, 2022).

134.    Claims 1-18 of the '930 patent are not entitled to any priority date before the filing date (02/25/22) of the application leading to the '930 patent.

135.    Claims 1-18 of the '930 patent recite new matter compared to prior parent applications and cannot properly benefit from an earlier effective filing date.

136.    Alternatively or additionally, the '744 patent (or any earlier-filed application) is prior art against the '930 patent for other reasons, such as because there is no proper common inventorship among the two patents.

137.    Continuity of inventorship is required for a child application to properly claim the benefit of priority to an earlier filed parent application.

138.    If Kucharsky and McKernan are the only correctly named inventors on the '152 patent, then it shares no common inventors with the '744 patent.

139.    None of the '915, '454, or '152 applications (or patents issuing from them) includes an "incorporation by reference" statement.

140.    None of the '915, '454, or '152 applications incorporates any disclosure by reference from any other application.

141.    Any appearance of overlapping inventorship from the '454 application should not be substantively effective given applicant's deceptive intent or other facts listed herein.

142.    Pub. No: US2019381386 is also available as prior art against the '930 patent.

143.    One or more of the '744 patent, the '386 publication, or the art cited during prosecution of or on the face of any of the aforementioned patents or applications renders every claim of the '930 patent valid alone or in combination under 35 U.S.C. § 102 or 103.

144.    Applicant forfeited any claim to continuity because of Applicant's deliberate manipulation of inventorship and other inequitable conduct described herein and cannot now

invoke any safe-harbor or other recourse to prevent the '386 publication or '744 patent from properly being considered prior art against the '930 patent.

### (Invalidity Under 35 U.S.C. § 112)

145.    Several claims are invalid for including terms that render the claim invalid under 35 U.S.C. § 112. Illustrative terms include "border flange," "protruding outward at an acute bevel angle relative to said zero-elevation surface," "a slant pattern," "substantially contiguous border flange," "substantially contiguous border flange edge," "border flange edge," and "border flange edge is beveled."

### (Invalidity Due to Wrong Inventorship)

146.    Inclusion of more or fewer than the true inventors renders a patent invalid.

147.    The '930 patent is invalid for incorrect inventorship. It is invalid for misjoinder by including one or more of Kucharsky or McKernan. Alternatively or additionally, it is invalid for nonjoinder in failing to name Abdelmalek.

148.    Anthony Abdelmalek is the only named inventor in the '311 application, '915 application, and '744 patent.

149.    On information and belief, Anthony Abdelmalek contributed to the conception of the subject matter claimed in the '311 application, '915 application, or '744 patent.

150.    The subject matter claimed in the '311 application, '915 application, and '744 patent is similar to that claimed in the '152 application and the '930 patent.

151.    The subject matter claimed in the '311 application, '915 application, and the '744 patent is sufficiently similar to that claimed in the '930 patent that if Abdelmalek is a properly named inventor on the '311 application, '915 application, or the '744 patent, then he should be named as an inventor on the '152 application and the '930 patent.

152.    During prosecution of the '454 application, the Patent Office issued a "double patenting rejection" on 05/04/2021 in view of the '744 patent. There, the Patent Office explained that: "A nonstatutory double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s)."

153.    That double-patenting rejection further confirms that the subject matter claimed in the '454 application was similar to that of the '744 patent.

154.    On information and belief, Anthony Abdelmalek contributed to the conception of the subject matter claimed in '930 patent and his lack of being a named inventor renders it invalid.

155.    Anthony Abdelmalek is not a named inventor on the '930 patent.

156.    Anthony Abdelmalek was intentionally not named as an inventor on the '930 patent.

157.    The inventorship of the '930 patent should not now be properly correctable for several independent or alternative reasons, including because not naming Abdelmalek was not a mistake or done through error; rather Applicant deliberately did not include Abdelmalek, intentionally excluded Abdelmalek as a named inventor, knowingly omitted Abdelmalek as a named inventor, or otherwise acted with deceptive intent before the Patent Office, as also explained in the "Inequitable Conduct" Count discussed herein and below. Even if inventorship could be corrected, that would be in an administrative sense and would not excuse or moot Applicant's misrepresentations amounting to inequitable conduct and its effects. Such potential administrative correction would not expunge or retroactively cure intentional misrepresentations

made to the Patent Office during prosecution and would not ameliorate inequitable conduct or restore priority lost through deceptive omissions.

### COUNT II – DECLARATORY JUDGMENT OF UNENFORCEABILITY

158.    StringKing incorporates by reference all facts recited in this Answer.

159.    The '930 patent is unenforceable for multiple independent bases. Illustrative facts supporting one or more bases are recited and summarized below.

### (Unenforceability Due to Failure to Disclose Prior Products)

160.    Applicant had a duty to disclose to the Patent Office material information about what the Complaint refers to as "RZR, RZR2, and LZR lacrosse gloves" ("the STX Products"). Alternatively or additionally, others involved in the filing or prosecution of the '152 application likewise had a duty to disclose such material information.

161.    Such material information includes when each STX Product was first offered for sale, sold, used, made, or otherwise publicly disclosed in the U.S.

162.    One or more of the STX Products are "covered by" the '930 patent, as confirmed by the Complaint, which admits that they are. *See* ECF 1 at ¶ 16. Plus, the Complaint further admits that one or more of the STX Products are covered by the '930 patent by stating: "At the time the '930 patent issued, STX updated its RZR glove website page with the patent number to give notice of its back of hand glove invention." ECF 1 at ¶ 20.

163.    On information and belief, STX indicates on its website the patents that cover each of the STX Products. An illustrative example is provided below related to the LZR gloves from https://stx.com/products/lzr-lacrosse-gloves (accessed 10/23/25). *See* Exhibit 9.



**Excerpt E5** (From Exhibit 9)

164.    Thus, the materiality of the above-mentioned information is confirmed by STX's

own admissions in its Complaint and on its website. The information is material to at least

claim 1 of the '930 patent. Based on STX's admissions, the information is also material to each

claim of the '930 patent. The information is not cumulative because the STX Products are said to

be covered by the '930 patent whereas, during prosecution, Applicant maintained that no other

art of record included all the claimed features.

165.    Applicant was aware of the aforementioned material information about the STX

Products, knew that it was material, and deliberately withheld it. This is the single most plausible

inference because the prosecution of the '454 made clear that new matter (such as the border

flange recited in claims 1, 4, 10, 11, 16, 17, and 19, or the "V-notches" of claim 11, or the slits of

claim 19) were new matter, thereby precluding Applicant from benefiting from any filing date

earlier that the actual filing date of the '152 application (02/25/22).

166.    On information and belief, at least one of the STX Products (e.g., STX's RZR,

RZR2, or LZR lacrosse gloves ) was made, sold, offered for sale, used, or otherwise publicly

disclosed before 02/25/22, which would have precluded the '930 patent from issuing because

it/they include all the claimed features recited in at least one claim of what came to be included in the '930 patent.

167.    Applicant knew when each STX Product was made, sold, offered for sale, used, or otherwise publicly disclosed. Applicant withheld the prior-sale information with an intent to deceive the Patent Office into issuing a patent because they knew that if the prior-sale information was disclosed to the Patent Office, then at least one claim of the '152 application would not be allowed or the '930 patent would not have been allowed to have issued.

168.    Applicant also withheld STX's or Burnett's belief or representation that one or more of the STX Products fell within the scope of at least one pending claim. On information and belief, this information was likewise withheld with an intent to deceive the Patent Office because that too would have precluded at least one pending claim of the '153 application from being allowed.

### (Unenforceability Due to Application Mischaracterizations, Lack-of-New-Matter Representations, and Priority-Claim Entitlements)

169.    Applicant had a duty to disclose to the Patent Office whether it contained new matter with respect to its predecessor '915 application and to properly characterize the '454 application's continuing-application status; namely, as relevant here, whether it was a continuation application or continuation-in-part (CIP) application. Applicant knew that the characterization of the '454 application was material information. Applicant knew that a proper continuation application is not allowed to include new matter with respect to its parent application. For example, the "disclosure presented in the continuation must not include any subject matter which would constitute new matter if submitted as an amendment to the parent application." MPEP 201.07. Applicant also knew that if the '454 application was characterized as a continuation application then it would be allowed to reap the benefit of an earlier effective

filing date as to all claimed subject matter and that the Patent Office would not (or would be less likely to) cite art that existed before that earlier effective filing date.

170.    Applicant specifically intended to deceive the patent office. From the day the '454 application was filed, Applicant knew that it contained new matter and should be filed as a CIP. Despite knowing that the '454 application included new matter, Applicant mischaracterized it as a continuation application. That mischaracterization was not inadvertent, as confirmed by the filename of the application filed being "CIP.pdf, which evidences that Applicant knew at the time of filing that the '454 application should be properly characterized as a CIP as shown in the following screenshot

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| **File Listing:** | | | | | |
| 1 | Application Data Sheet | WebADS.pdf | 140611 <br> bf51a2bd24c97f9e4b3dcf276756f72dfd6fd976 | no | 8 |
| **Warnings:** | | | | | |
| | | | | | |
| **Information:** | | | | | |
| 2 | | CIP.pdf | 287040 <br> b9fd1e035d2c2153f92abc2b0c49ea290f4f98d8b8a | yes | 27 |

**Excerpt E6** (from Exhibit 10 at p. 20).

171.    Yet, Applicant characterized the '454 application as a continuation application (1) in an application data sheet and (2) in the body of the '454 application when filed. Applicant attempted to exploit its mischaracterization by relying on an earlier effective filing date in an attempt to disqualify cited prior art (such as Leary) even though the claims recited new matter (such as a border flange). By mischaracterizing the '454 application as a continuation

application, Applicant attempted to prevent the Patent Office from ever citing after that existed before the filing date of the '915 application even though Applicant knew that the '454 application included new matter as compared to prior filed applications. Applicant further sought to avoid the '744 patent from being cited as prior art under 35 U.S.C. § 102 by characterizing the '454 application as a continuation and intimating commonality of ownership at the time of filing (01/07/2019) even though there was not.

172.    The '454 application contained new matter as compared to the '744 patent.

173.    Illustrative new matter includes slits in the glove, v-notches, and a border flange.

174.    The '930 patent would not have issued without Applicant's misrepresentation. This is confirmed by the fact that the Patent Office refused to allow the '454 application and Applicant's inability to recharacterize the '454 application as a CIP. Once Applicant was caught by the Patent Office, instead of accepting that the Patent Office would not allow a patent to grant from the '454 application, Applicant compounded the issue by filing a new application (the '152 application) and recharacterizing the '454 application as a CIP even though the Patent Office never recognized that it was a CIP despite Applicant's attempt to do so.

175.    Applicant ultimately avoided or stopped trying to recharacterize the '454 application as a CIP in the prosecution of the '454 application. Thus, the Patent Office regarded it as a continuation application.

176.    Upon filing the '152 application, instead of proceeding with the '454 application's status as a continuation application, Applicant mischaracterized it again, this time as a CIP application to try to accomplish what could not be accomplished in the prosecution of the '454 application. Applicant successfully obfuscated its misrepresentations such that the Patent Office did not notice, leading to the issuance of the '930 patent, which would never have occurred but

for the Patent Office being unaware of Applicant's sleight of hand, as confirmed by the fact that the Patent Office refused to allow the '454 application to issue and refused to allow Applicant to change the Applicant's original mischaracterization.

### (Unenforceability Due to Inventorship Misrepresentations)

177.    Applicant had a duty to accurately disclose to the Patent Office who the proper inventors of claimed subject matter were. As to the '454 application, Applicant intentionally failed to do so. Applicant intentionally misrepresented inventorship by adding Kucharsky or McKernan. A proper continuation application cannot add new matter; and if Abdelmalek was properly named as the only inventor on the '744 patent, then there should have been—and on information and belief, there was—no reason to properly name Kucharsky or McKernan. Instead, Applicant acted with deceptive intent in adding Kucharsky and McKernan so that there could superficially appear to be overlapping inventors that would allow Abdelmalek to ultimately be removed from later applications and to obtain a patent that did not include Abdelmalek (which occurred in the issuance of the '930 patent). Applicant desired to position the '152 application so that one or more then-current employees of STX would appear on the issued '930 patent rather than the true inventor who had long since left STX. Had the Patent Office known that Kucharsky or McKernan were not properly named inventors, it would not have otherwise allowed the '454 application.

178.    Alternatively or additionally, Applicant intentionally removed (or avoided naming) Abdelmalek as an inventor when filing the '152 application and did so with intent to deceive the patent office into issuing what became the '930 patent. Applicant knew that naming the correct inventors was material to the patentability of any claimed invention. Burnett or STX wanted to misrepresent to the market that Abdelmalek did not contribute to the conception of any subject claimed at any time in the '152 application or '930 patent.

43

179.    Abdelmalek was no longer an employee of STX when the '152 application was filed (02/25/22). But, on information and belief, Kucharsky and McKernan were (Kucharsky is still an STX employee and McKernan did not leave STX until May 2022). Burnett or STX wanted only then-current STX employees named inventors on the '930 patent because that would convey to the market that it was STX (or Burnett) who was currently responsible for conceiving the subject matter claimed in the '930 patent rather than a former employee. This could be achieved by manipulating inventorship such that only Kucharsky and McKernan would appear on the face of the '930 patent, which is what occurred. If the Patent Office had known that Abdelmalek contributed to the subject matter claimed in the '930 patent or would have otherwise known that Abdelmalek should have been a named inventor, it would not have allowed the '152 application to ripen into the '930 patent.

180.    On information and belief, at least one of Kucharsky or McKernan did not contribute to the conception of any subject matter claimed in the '454 application.

181.    On information and belief, at least one of Kucharsky or McKernan did not contribute to the conception of any subject matter claimed in the '930 patent.

182.    On information and belief, Abdelmalek contributed to the conception of at least some of the subject matter claimed in the '930 patent.

183.    Applicant's misrepresentations regarding inventorship that amount to inequitable conduct cannot be excused even if the patentee were to later correct the misrepresentation. Any correction procedure—if applicable—would not nullify or cleanse prior deceptive prosecution conduct.

## COUNT III – DECLARATORY JUDGMENT OF NONINFRINGEMENT

184.    StringKing incorporates by reference all facts recited in this Answer.

185.    StringKing does not infringe any valid claim of the '930 patent.

186.    The accused StringKing product(s) do not include one or more properly construed limitations of the claim charted in the Complaint. For example, on information and belief, the accused product does not include one or more of the following properly construed limitations of claim 1 of the '930 patent: (a) a unitary dorsal panel configured to attach to the palmar section and cover the back of said wearer's hand including at least four fingers; (b) the dorsal panel consisting of an integrally-molded elastomeric member formed with a main section and adjacent finger sections sharing a common zero-elevation surface and a patterned array of foam protective pads each defining an individual island raised from said zero-elevation surface; (c) said patterned array of foam protective pads including a plurality of foam protective pads extending along each finger section; (d) the foam protective pads within each finger section being aligned end-to-end and separated from adjacent foam protective pads by interstitial channels having a width within a range of from 1-4 mm; (e) a border flange circumscribing said finger sections of said dorsal panel; (g) said border flange protruding outward from said zero-elevation surface around said finger sections, and protruding outward at an acute bevel angle relative to said zero-elevation surface around at least four of said adjacent finger sections; (h) said border flange . . . protruding outward at an acute bevel angle relative to said zero-elevation surface around at least four adjacent finger sections, wherein the palmar section is stitched to said border flange surrounding at least two of said adjacent finger sections; (i) said dorsal panel further comprising, a main section, five finger sections each protruding from said main section, and a substantially contiguous border flange surrounding and projecting outward around the entire unitary dorsal panel inclusive of said main section and each of said five finger sections; (j) said border flange edge along a portion of said at least four finger sections comprises one or more slits therebetween for added flexibility; or (k) said border flange edge is beveled by an inclined

surface sloping away from said zero-elevation surface around at least two adjacent finger sections.

## COUNT IV – STX FALSELY MARKED ITS PRODUCTS

187.    StringKing incorporates by reference all facts recited in this Answer.

188.    On information and belief, STX deliberately marked at least one or more of its products (including the STX Products) with the '930 patent, knowing it to be invalid or unenforceable and continues to falsely mark at least the STX Products that are available for purchase from within this District and throughout the United States including via STX's website.

189.    STX's Complaint admits that "At the time the '930 patent issued, STX updated its RZR glove website page with the patent number to give notice of its back of hand glove invention." ECF 1 at ¶ 20 (citing its Exhibit D). That admission is binding on STX.

190.    On information and belief, when STX updated its website as indicated, STX knew that the '930 patent was invalid or unenforceable for the reasons set forth in detail herein. Even so, STX still updated its website as described, and did so with an intent to deceive the public by indicating that one or more of the STX Products were covered by a patent known to be invalid, unenforceable, or both.

191.    On information and belief, STX has marked its products with a reference to the '930 patent in other ways as well, such as on product packaging, marketing materials, in communications with suppliers or customers, and the like, in this District and in the U.S.

192.    STX admits that StringKing's "Flyer 1" is "in competition with the enumerated STX lacrosse gloves." ECF 1 at ¶ 19. For purposes of this count, StringKing acknowledges that admission as binding on STX.

193.    On information and belief, STX marked its STX Products to help distinguish them in the market and to help convey them as new, novel, or otherwise having beneficial features that merit patent protection.

194.    On information and belief: STX's false marking has diverted customers, sales, or both from StringKing; STX has referenced the '930 patent when interacting with retailers; retailers have factored STX's purported patent coverage into whether to stock or offer StringKing's products for sale based on STX's false marking and causing competitive injury to StringKing in the form of lost retailers, lost sales, or lost customers.

195.    On information and belief, at least one retailer has opted to not offer at least one of StringKing's products because of STX's false marking of its products. For example, at least one retailer avoided offering StringKing's products for fear that STX might make an infringement allegation against them. Alternatively or additionally, the retailer viewed the STX Products as more innovative than StringKing's products because STX represented that its products were covered by the '930 patent (which it knew to be invalid or unenforceable) and thus chose to promote the STX Products instead of or more than StringKing's products, causing competitive injury to StringKing.

196.    On information and belief, at least one product reviewer, influencer, or promoter has mentioned STX's patent coverage, which is false, and that false marking has caused at least one customer to an STX Product over a StringKing product, resulting in competitive harm to StringKing.

197.    This harm continues as long as STX maintains its false representation that the STX Products are covered by a valid patent.

## <u>COUNT V – UNFAIR COMPETITION</u>

198.    StringKing incorporates by reference all facts recited in this Answer.

199.    StringKing markets its Flyer 1 glove, but as a result of STX's false marketing its competing products as being covered by a valid and enforceable patent that STX knows is not valid or enforceable, sales of StringKing's Flyer 1 glove have been eroded.

200.    STX (or Burnett) has engaged in a course of conduct constituting unfair competition under Delaware common law, including the wrongful procurement, assertion, and exploiting of one or more patents obtained through inequitable conduct or other deceptive means before the Patent Office or by holding out competing articles as being covered by a valid and enforceable patent that STX knows is not.

201.    On information and belief, STX (or Burnett) has used the '930 patent to threaten, intimidate, or discourage retailers, distributors, or consumers from purchasing or offering one or more of StringKing's products, including the Flyer 1 glove.

202.    On information and belief, these threats and representations include communications to actual or potential commercial partners/retailers, patent markings, and statements implying that StringKing's glove infringes at least the '930 patent, that STX products are properly covered by the '930 patent, and that STX (or Burnett) would exercise its patent rights even though STX knew or should have known that the '930 patent was invalid or unenforceable.

203.    On information and belief, STX (or Burnett) acted with knowledge of the defects in inventorship, priority, validity, or enforceability described herein and with the intent and effect of suppressing legitimate competition and deceiving the trade and the public into believing that STX or Burnett possessed patent rights that it did not.

204.    On information and belief, StringKing has suffered and continues to suffer injury in its trade and business because of STX's unfair and deceptive conduct, including in the form

48

of, for example, lost or eroded sales or profits, lost or impaired retailer and distributor relationships, loss of goodwill, or reputational harm.

205.    On information and belief, STX's and Burnett's acts were willful, wanton, and undertaken in bad faith, warranting an award of damages and such further equitable relief as the Court deems just and proper.

### StringKing's Prayer for Relief

WHEREFORE, StringKing requests that this Court:

1) adjudicate the rights and liabilities of the parties with respect to the '930 patent;

2) find and declare that the '930 patent is invalid;

3) find and declare that the '930 patent is unenforceable;

4) find and declare that StringKing does not infringe any valid claim of the '930 patent;

5) find and declare that STX is liable for false patent marking;

6) find and declare that STX/Burnett has engaged in unfair competition;

7) award to StringKing its costs, expenses, and attorneys' fees as permitted by, for example, 35 U.S.C. §285 given that this case is exceptional; and

8) grant StringKing such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Defendant and Counterclaim Plaintiff StringKing hereby demands a trial by jury of all claims and counterclaims asserted in this action.

/s/ Andrew E. Russell
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
Virginia K. Lynch (No. 7202)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
nhoeschen@shawkeller.com
glynch@shawkeller.com
*Attorneys for Defendant StringKing, Inc.*

OF COUNSEL:
Jesse J. Camacho
PRACTUS, LLP
3810 NE 95th Street
Kansas City, MO 64156
(816) 343-4301

Dated: November 24, 2025

50