**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| STX, LLC,<br><br>      Plaintiff,<br><br>         v.<br><br>STRINGKING, INC.<br><br>      Defendant. | C.A. No. 25-1359-JLH-EGT |

**DECLARATION OF MICHAEL S. LEE IN SUPPORT OF
PLAINTIFF STX, LLC'S OPPOSITION TO STRINGKING'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON PRIORITY DATE**

I, Michael S. Lee, hereby declare as follows:

**I.     BACKGROUND**

1.      I have been retained by Plaintiff STX, LLC ("STX" or "Plaintiff") in connection with the above captioned action. I have been asked by STX to offer technical analysis and opinions regarding whether the claims of U.S. Patent No. 12,274,930 (the "'930 Patent") are entitled to the earlier filing date of U.S. Patent Application No. 16/241,454 (the "'454 Application") filed January 7, 2019, to which the '930 Patent claims priority as a continuation-in-part ("CIP").  More specifically, I have been asked to offer technical analysis and opinions regarding whether the '454 Application provides adequate written description support under 35 U.S.C. § 112(a) for the claims of the '930 Patent, which issued on April 15, 2025 from U.S. Application No. 17/681,152 (the "'152 Application") filed February 25, 2022.

2.      This declaration sets forth the opinions I have reached to date regarding these matters. I have personal knowledge of the facts stated herein, and if called to testify as a witness, I could and would testify competently thereto. I reserve the right to supplement my declaration with information learned and materials obtained during discovery.

1

3.      I am being compensated by STX at my standard hourly consulting rate of $1,250 per hour for my time spent on this matter. My compensation is not contingent on the outcome of the action or on the substance of my opinions.

4.      I have no financial interest in STX.

## II.      EDUCATION AND WORK HISTORY

5.      My education and experience are described more fully in the attached curriculum vitae (Appendix A). For ease of reference, I have listed some of my relevant achievements below. In formulating my opinions, I have relied upon my knowledge, training, and experience in the relevant art.

6.      I have a Bachelor of Science in Mechanical Engineering from Lehigh University and a Juris Doctor from The Columbus School of Law.

7.      I am admitted to practice before the United States Patent and Trademark Office ("PTO") and the bars of the State of Maryland, the District of Columbia, and the Commonwealth of Virginia.

8.      I am a registered patent attorney and have practiced in the field of intellectual property law for 35 years.

9.      I worked as a Patent Examiner at the PTO for five and a half years and I examined over 500 patent applications in a variety of technical fields including rotary kinetic fluid motors, turbomachines, aircraft, optics, and dynamic information storage and retrieval systems.

10.      I have extensive experience in patent prosecution, patent litigation, and the analysis of patent specifications and claims, including the evaluation of written description support under 35 U.S.C. § 112(a). I am familiar with the standards applied by the PTO and the

federal courts in assessing whether a patent specification provides adequate written description support for claimed subject matter.

11.     I am a founding member of Plumsea Law Group, LLC ("Plumsea").

12.     Plumsea has provided patent prosecution services to STX for approximately 8 years. Although I have not been personally involved in the day-to-day patent prosecution work performed on behalf of STX, my firm's longstanding engagement with STX has afforded me a working familiarity with the technology at issue in this matter. Drawing on that background, as well as my 35 years of experience in patent prosecution practice and PTO procedures, I am well qualified to opine on the written description and priority date issues presented in this case.

## III.   MATERIALS CONSIDERED

13.     In forming my opinions, I have reviewed the following materials:

- the '930 Patent;

- the '152 Application and its prosecution history;

- the '454 Application and its prosecution history;

- U.S. Patent No. 10,201,744 (the "'744 Patent"), which issued from U.S. Application No. 14/602,915 (the "'915 Application");

- StringKing's Opening Brief in Support of Its Motion for Partial Summary Judgment on Priority Date (D.I. 63) and the accompanying exhibits;

- the exhibits submitted in support of and in opposition to StringKing's Motion for Partial Summary Judgment on Priority Date submitted with STX's opposition; and

- other publicly available materials relevant to my analysis.

Additionally, I have relied on the materials cited throughout my declaration.

3

14. In reaching my opinions, I have relied upon my experience in the field and also considered the viewpoint of a person of ordinary skill in the art ("POSITA") at the time of the earliest claimed priority date of the '930 Patent.

## IV. LEGAL PRINCIPLES

15. I understand that to claim priority under 35 U.S.C. § 120 to an earlier filed application, the invention must be disclosed in the earlier filed application as required by 35 U.S.C. § 112(a).

16. It is my understanding that 35 U.S.C. § 112(a) requires that a patent's specification satisfy certain requirements, including that the specification must describe the invention sufficiently to convey to a POSITA that the applicant had possession of the claimed invention at the time of the application, i.e., that the applicant invented what is claimed. This requirement is known as the "written description" requirement. In addition, the specification must describe the manner and process of making and using the invention so as to enable a POSITA to make and use the full scope of the invention without undue experimentation. This requirement is known as the "enablement" requirement.

17. It is my understanding that to meet the written description requirement, the specification must reasonably convey the claimed invention to a POSITA. In other words, the patent specification must reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date. I also understand that the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology. I further understand that the written description requirement does not require working examples or evidence in the patent of an actual reduction to practice. I understand that the specification is written for the POSITA, and, thus, it is unnecessary to spell out every detail of the invention in

4

the specification; the inventor need only include enough information to convey to a POSITA that the inventor possessed the invention.

## V.    BACKGROUND

### A.    PTO Procedures

18.    To obtain a patent, an applicant files a patent application containing a specification with a written description of the invention, one or more claims defining what the applicant regards as the invention, and any necessary drawings. A patent examiner then reviews the application to determine whether it complies with the statutory requirements of 35 U.S.C. § 1 *et seq.*, as further governed by 37 C.F.R. § 37 and the Manual of Patent Examining Procedure.

19.    To evaluate patentability, the examiner searches for prior art, including prior patents, printed publications, public use, sales activity, or other public availability predating the application's effective filing date, and considers whether each claim defines subject matter that is new, useful, and nonobvious in light of that prior art.

20.    The examiner then issues a written "Office Action" advising the applicant whether any claims are allowable. The examiner is required to make "a thorough study [of an application for examination]" and "a thorough investigation of the available prior art relating to the subject matter of the claimed invention." 37 C.F.R. § 1.104(a)(1). This necessarily includes a thorough review of the application's specification, including any prior art references cited therein. Examiners have been instructed to do so at least since the beginning of my experience in patent law.

21.    If any claims are rejected, the applicant may respond by amending or cancelling claims, adding new claims, or arguing that the existing claims should be allowed. Applicants may also submit affidavits or declarations as evidentiary support. 37 C.F.R. § 1.132. The examiner then reevaluates the pending claims in light of any amendments or arguments. This

back-and-forth typically continues until either the examiner allows one or more claims and the applicant elects to proceed to issuance, or the applicant abandons the application and files a new one claiming priority to the earlier filing.

22.    In my experience, an applicant may file a CIP for reasons unrelated to any Section 112 rejection, such as broadening claim scope, addressing prior art, consolidating prosecution, or advancing prosecution efficiently after contesting the examiner's findings.

**B.    The '930 Patent**

23.    I understand that STX has accused Defendant StringKing, Inc. ("StringKing" or "Defendant") of infringing the '930 Patent, which is entitled "Stitchless Dorsal Padding for Protective Sports Gloves and Other Protective Gear." The '930 Patent issued from the '152 Application filed on February 25, 2022. The '930 Patent claims priority as a CIP to the '454 Application, filed on January 7, 2019.

24.    I have reviewed the entire prosecution history of the '930 Patent. I would be prepared to testify regarding each step in the prosecution history, the meaning of PTO terms, the purpose of PTO procedures and forms, and PTO procedures related to each document in the prosecution history, in whatever detail would be appropriate.

25.    This declaration addresses only the portion of the prosecution history relevant to StringKing's Motion. The discussion is limited accordingly for purposes of brevity.

26.    In an Office Action dated March 28, 2024, the Examiner noted with respect to application of prior art in an obviousness rejection under 35 U.S.C. § 103 that "[t]he effective filing date of claim 1 and its dependent claims is 2/25/22 as claim 1 recites a bevel angle." Ex. 2[1] at 5-6. The Examiner provided no rationale for the statement.

---

[1] References to "Exhibit" or "Ex." herein refer to exhibits attached to the Declaration of Julie C. Giardina ("Giardina Decl.").

27.    The Section 103 obviousness rejection related to the following prior art references:

- U.S. Patent App. Pub. No. 2015/0047087 ("Contant"), dated February 19, 2015;

- U.S. Patent App. Pub. No. 2016/0325173 ("Leary"), dated November 10, 2016; and

- U.S. Patent No. 4,570,269 ("Berlese"), dated February 18, 1986.

Each of the three prior art references was published and/or has a priority date of 2016 or earlier. Ex. 3. Therefore, each would have qualified as prior art even under the January 7, 2019 filing date. Ex. 2 at 6;. Arguing priority based on the Examiner's statement would have had no practical impact on the obviousness rejection.

28.    Applicant's June 24, 2024 Reply did not address the Examiner's application of a priority date based on the "bevel angle" that claim 1 recited because Applicant proceeded to incorporate into claim 1 the subject matter of application claim 3 which had been found allowable. The amendment to claim 1 also included changing "bevel angle" to "acute bevel angle" because claim 3 originally recited "an acute angle." Ex. 4 at 2, 9.

29.    A Notice of Allowance issued thereafter. Ex. 5.

30.    The Applicant did not face a binary choice between arguing priority and accepting allowable subject matter—the allowable claims were identified on the merits of the prior art analysis, not as a consequence of which priority date applied.

**C.    The '454 Application**

31.    U.S. Application No. 16/241,454 (the "'454 Application") was filed January 7, 2019 and according to the Application Data Sheet ("ADS") claimed direct priority as a

continuation of U.S. Application No. 14/602,915 (the "'915 Application") filed January 22, 2015. Ex. 7 at 4-5; Ex. 17 at 1. The Filing Receipt reflected the priority listed in the ADS. Ex. 8 at 1.

32.     Dependent claim 3 as filed recited "said unitary dorsal panel is formed with a border flange" and claim 5 specified that "said border flange . . . has a width within a range of 2-8mm." Ex. 9 at 1. Independent claim 1 did not recite a "border flange." *Id.*

33.     A Non-Final Office Action (the "First Action") dated September 4, 2020 did not include any rejections under 35 U.S.C. § 112 based on the "border flange" language. Ex. 10 at 3. Claim 5 was rejected under 35 U.S.C. § 103 and the Examiner stated "that the limitations of claim 5 (within a range of 2-8mm) have an effective filing date of 1/7/2019" but did not include any reference to an effective filing date of the claimed "border flange" itself. *Id.* at 7.

34.     Applicant filed a Reply ("First Reply") to the First Action on January 4, 2021 and argued "[t]he Examiner contends that the limitations of claim 5 (border flange within a range of 2-8mm) only has an effective filing date of 1/7/2019. However, [the '915 Application] unequivocally describes a 'border surrounding dorsal panel is within a range of from 4-8 mm across' [and] Applicant herein amends claim [5] to recite a border flange within a range of 4-8mm to regain proper priority and eliminate Leary as prior art." Ex. 11 at 10. In other words, Applicant amended the claims to include a border flange "within a range of 4-8mm" because that was the express range the '915 Application set forth and a feature that Applicant asserted distinguished the claims over the prior art.

35.     A second Non-Final Office Action (the "Second Action") dated May 4, 2021 for the first time set forth that "Applicant is required to delete the benefit claim or change the relationship (continuation [] application) to continuation-in-part because the ['454] application

contains the following matter not disclosed in the prior-filed ['915] application," including, among other things:

> **Specification paragraphs**: [] [0009] . . . a substantially contiguous border **flange** surrounding the entire unitary dorsal panel . . . [00040] the border **flange** surrounding dorsal panel can be within a range of from 2-8 mm across, and most preferably a 5-6 margin, (portion of paragraph 00040 starting with "Palmar sections, such as palmar section 192 can be fused, welded, stitched, molded or otherwise connected to the border flange 166 . . . and the latter is stitched thereto around at least a portion of all four of the finger receiving portions 27,28,29 and thumb 30").

Ex. 12 at 2 (emphasis in original).

36.    The Second Action also set forth that a replacement drawing submitted on April 1, 2019 included "additional details to Figure 6, particularly to a slope 166," which constituted new matter because the '915 Application "does not include this feature of the border." *Id.* at 9. The replacement drawing was not entered. *Id.* at 10.

37.    The Second Action further included rejections under 35 U.S.C. §112(a) for failing to comply with the written description requirement because "a continuation application may not add any new subject matter not previously disclosed in the parent application," and claims 3-6, 10, 17, and 19-21 recited "a border flange and various limitations to the border flange. However, the parent application provides support for a substantially contiguous border but doesn't provide support for a 'border flange.'" *Id.* at 11.  In addition, "support for the examiner's interpretation of the border flange as constituting new matter is found in applicant's response to the prior art rejections (remarks of 1/4/2021) where applicant points to a definition of 'flange' as a 'projecting rim, collar, or ring . . . formed to give additional strength, stiffness, or supporting area.'" *Id.*

38.    Further, according to the Second Action, "Claim 21 recites said border flange . . . comprises one or more slits for added flexibility and claim 22 recites a top surface of said border flange is sloped relative to said zero-elevation surface." *Id.*  The second Action also included

rejections under Section 103 stating that claims 3-6 and 10 "[receive an effective filing date of 1/7/2019 because the provisional application doesn't disclose . . . a substantially contiguous border flange and a substantially contiguous border flange stitched to the palmar section, in addition to the features of claims 3-6 and 10." *Id.* at 15.

39.     Further, in response to the arguments in Applicant's First Reply, the Second Action indicated that "Applicant submits that the limitations of claim 5 receive the benefit of the priority application; however, as noted above, the recitation of 'border flange' is considered as new matter." *Id.* at 22.

40.     Applicant filed a Reply ("Second Reply") to the Second Action on August 4, 2021.  Among other things, Applicant amended the specification to indicate in the "Cross-Reference to Related Applications" that the '454 Application was a continuation-in-part and not a continuation of the '915 Application." Ex. 13 at 7.  Applicant submitted that the objections to the drawings set forth in the Second Action based on the addition of references 166 (slope), 168 were moot in view of the amended cross-reference statement. *Id.* at 10.

41.     In response to the written description rejections under Section 112, Applicant argued against the propriety of the rejections despite the amendment to the cross-reference statement rendering the rejections moot.  *Id.* at 11.  Applicant argued:

> The Examiner rejects claims 1-22 under 35 U.S.C. 1 12(a) as failing to comply with the written description requirement. The Examiner contends that claims 3-6, 10, 17, and 19-21 recite a border flange and various limitations to the border flange, whereas the parent application only provides support for a substantially contiguous border but doesn't provide support for a "border flange." Applicant submits that a mere change in semantics from "border" to "border flange" is not new matter where a "flange" is defined as a "projecting rim" and the ['915 Application] describes a border surrounding dorsal panel and projecting "within a range of from 4-8 mm across, and most preferably a 5-6 mm margin." Nevertheless, Applicant believes that its amendment to the "Cross-Reference" to label this a continuation-in-part application moots this rejection.

*Id.*

42.     A Final Office Action (the "Final Action") issued August 25, 2021 and noted that despite Applicant's amendment to the cross-reference statement in the specification, an amended ADS had not been filed to change the priority claim from continuation to a CIP.  Ex. 14 at 2. Accordingly, the Final Action maintained the objections to the replacement drawings and rejections under Section 112 (and noted in the rejections under Section 103) based on a border flange and various border flange limitations not finding support in the '915 Application.  *See id.* at 2-15.

43.     Applicant filed a Reply ("Reply to Final") to the Final Action on January 25, 2022 and submitted with the Reply to Final a corrected ADS changing the priority from continuation to CIP. Ex. 15 at 6.

44.     In the Reply to Final, Applicant also (again) contested the alleged lack of support for a "border flange" in the '915 Application, citing, e.g., specific disclosures, semantic language differences, and case law to support for a third time the positions that Applicant had maintained through two previous replies to office actions, that the '915 Application did support the "border flange" and associated limitations.  *Id.* at 2-9.

45.     The below excerpts are only a sample of the extensive arguments Applicant made in the Reply to Final against the assertions that the "border flange" and limitations were new matter and the related Section 112 rejections, to which Applicant clearly did not acquiesce at any point during prosecution of the '454 Application. Applicant further clarified that claim amendments to remove the word "flange" were solely for removing "any lingering doubt" that the claimed "border" in the '454 Application was supported by the '915 (parent) Application disclosure.

> *1) substantially contiguous border flange surrounding the entire unitary dorsal panel [0009]*: see FIG. 1 and column 7, lines 32-40 (dorsal section 40 of blank

may be cut (die, laser, rotary-blade, water-jet, etc.) using an outline cut that results in **a substantially contiguous border framing** the dorsal panel 40 , 140.  In other words, the present application adds the word flange to "substantially contiguous border *flange* surrounding the entire unitary dorsal panel" in an attempt to be more explicit. This is a semantic choice, but the drawings and description of the parent application relied upon fully articulate what it is in all physical respects, and fully enable practice of the present invention. The exact terms need not be used. *Eiselstein v. Frank*, 52 F.3d 1035, 1038, 34 USPQ2d 1467, 1470 (Fed.Cir.1995); *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1376, 62 USPQ2d 1917, 1922 (Fed.Cir.2002) ("[T]he disclosure as originally filed does not have to provide in haec verba support for the claimed subject matter at issue."). Rather, the parent application must "reasonably convey[] to the artisan that the inventor had possession at that time of the later claimed subject matter." *In re Kaslow*, 707 F.2d 1366, 1375 (Fed. Cir. 1983); *Ralston Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d 1570, 1575 (Fed. Cir. 1985); *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991). In this case the parent application fully-disclosed a unitary molded dorsal panel with a zero-elevation surface that extends beyond and surrounds the pads to form a surrounding border, and calling this border a 'border flange' does not change the scope of the invention. If there is any lingering doubt Applicant herein removes the term flange from the present claims and confines the amended claim language to the original parent specification to remove any question that the parent application fully articulates the presently-claimed invention in all physical respects, and fully enables practice of the present invention.

. . .

The Examiner rejects claims 3-6, 8, 10, and 17-22 under 35 U.S.C. 112(a) as failing to comply with the written description requirement, because they contain subject matter which was not described in the *parent* specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor had possession of the claimed invention. The Examiner contends that claims 3-6, 10, 17, and 19-21 recite a border flange and various limitations to the border flange, whereas the parent application provides support for a substantially contiguous border. As stated above the addition of the word flange is a semantic choice, but the drawings and description of the parent application relied upon fully articulate what the border is in all physical respects, fully enable practice of the present invention, and "reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter."

*Id.* at 6-7, 9 (emphasis in original).

46.    Applicant's express reason for changing the '454 Application from a continuation to a CIP of the '915 Application related not to conceding that the border flange was not supported by the '915 Application but to claim 21 and the limitations to "one or more slits along

12

a portion of said five finger sections, the slits positioned there between for added flexibility," for which "Applicant acknowledges that slits 168 were not disclosed in the parent application." *Id.* at 10. Applicant nonetheless noted that "they are fully disclosed in the present application and so this rejection is respectfully mooted by correction of the ADS because the present application is a continuation-in-part, and Applicant is not claiming full priority." *Id.*

47.     An Advisory Action issued on February 4, 2022 and indicated that the Reply to Final had not put the '454 Application in condition for allowance because claim amendments including "limitations to the border edge as 'beveled' [and] limitations to the beveled surface" were not previously recited and required new consideration, and the revised priority required further review.   Ex. 16 at 3. The Advisory Action did not refer to the "border flange" or Applicant's remarks regarding support in the '915 (parent) Application or the Section 112 rejections. *Id.*

48.     The '152 Application (which led to the '930 Patent), was then filed as a CIP to the '454 Application, which went abandoned.  The '152 Application did not encounter any rejections during prosecution under Section 112 or based on support for a "border flange," because the '454 Application indisputably disclosed the "border flange" as it was the very subject of contested priority between the '454 Application and the '454 Application's parent, the '915 Application.

49.     Further, the '152 Application did not encounter any rejections under Section 112 regarding support for the term "acute bevel angle" and as I have set forth below, the '454 Application provides support for a border flange protruding outward at an acute bevel angle relative to a zero-elevation surface, at least as early as the filing date of the '454 Application.

### D.    The '972 Application

50.    I understand that United States Patent Application No. 19/036,972 (the "'972 Application") was filed January 24, 2025 and claims priority as a continuation to the '930 Patent. The '972 Application received a Notice of Allowance on April 2, 2026.  Ex. 19.

51.    The Examiner for the '972 Application is the same Examiner (Ms. Katherine Moran) that examined the '930 Patent.  *See* Ex. 5 at 5-6; Ex. 18 at 2, 8. During prosecution of the '972 Application, no statements regarding the priority date for a "bevel angle" were made and no rejections based on prior art were issued.  The only rejection under 35 U.S.C. § 112 related to enablement and a claimed "vent."  Ex. 18 at 5-6.

52.    The Examiner received and signed off on an Information Disclosure Statement ("IDS") filed on February 9, 2026 disclosing documents from this litigation.  The IDS was filed after Applicant replied (on February 5, 2026) to an Office Action mailed September 5, 2025, in which the enablement rejection was set forth.  Ex. 20. Applicant filed a Terminal Disclaimer in response to a double patenting rejection also set forth and amended the claims to recite "opening" in place of "vent," to obviate the rejections.  Ex. 21; Ex. 22 at 2, 6-7.  After Applicant filed the IDS, it was marked Considered by the Examiner on March 5, 2026 and the Notice of Allowance issued April 2, 2026. Ex. 19 at 1, 5, 13.

## VI.    THE '454 APPLICATION PROVIDES ADEQUATE WRITTEN DESCRIPTION SUPPORT FOR THE '930 PATENT CLAIMS

### A.    The '454 Application Discloses a Border Flange "Protruding Outward at an Acute Bevel Angle Relative to Said Zero-Elevation Surface"

53.    Claims 1 through 18 of the '930 Patent recite, in relevant part, a border flange "protruding outward at an acute bevel angle relative to said zero-elevation surface." Ex. 6 at Claims 1-18. Claim 19 recites a related limitation concerning a "border flange edge" that "is beveled by an inclined surface sloping away from said zero-elevation surface." *Id.* at Claim 19.

14

The central question in this written description analysis is whether the '454 Application's specification, as of its January 7, 2019 filing date, conveys to a POSITA that the inventor possessed a border flange with these characteristics.

54.     In my opinion, it clearly does. The '454 Application discloses that "[t]he border flange 166 may also have a non-flat cross section configured to avoid interference between the border flange 166 of adjacent finger-receiving sections 27, 28, 29, 30 and 31. For example, the border flange 166 may be sloped, beveled or tapered outwardly away (see FIG. 6 bottom) from the finger-receiving sections 27, 28, 29, 30, and relative to the zero-elevation surface." Ex. 17 ¶ [0050]. This disclosure plainly describes the orientation of the border flange relative to the zero-elevation surface—not merely a "shape" of the flange. The words "sloped," "beveled," and "tapered outwardly away" inherently describe how the border flange is oriented, that is, at an angle relative to the zero-elevation surface.

55.     The '930 Patent claims recite a border flange "protruding outward at an acute bevel angle relative to said zero-elevation surface." Ex. 6 at Claims 1-18. In my opinion, a POSITA reading the '454 Application's description of a border flange that is "sloped, beveled or tapered outwardly away . . . relative to the zero-elevation surface" (Ex. 17 ¶ [0050]) would understand the inventor to have been in possession of a border flange protruding outward at a bevel angle relative to the zero-elevation surface.

### 1. The "Acute Bevel Angle" Is the Geometric Relationship Between Components Already Disclosed in the '454 Application

56.     StringKing contends that the '454 Application fails to disclose a border flange "protruding outward at an acute bevel angle." D.I. 63 at 10-13. In my opinion, this argument reflects a fundamental misconception of what the claims require. The claimed "acute bevel angle" is not a discrete, separately disclosable component or feature that requires independent

15

written description support. Rather, the "acute bevel angle" is simply the geometric relationship between a border flange (a component disclosed in the '454 Application) that protrudes outward (a configuration disclosed in the '454 Application) in a beveled arrangement (an arrangement disclosed in the '454 Application) relative to the zero-elevation surface (a reference point disclosed in the '454 Application).

57.     Each of these individual elements is expressly disclosed in the '454 Application. The '454 Application shows and/or describes: (a) a border flange 166 component; (b) the identified border flange configured in a protruding outward relationship from the zero-elevation surface and dorsal panel when "an outline cut . . . results in a substantially contiguous border flange 166 framing the dorsal panel 40, 140"; and (c) the identified border flange having an orientation "beveled . . . outwardly . . . relative to the zero-elevation surface," (Ex. 17 ¶ [0050]) defining the angled relationship ("bevel angle") the '930 Patent claims require.

58.     The "bevel angle" claimed in the '930 Patent is defined by the border flange configuration described in the '454 Application as "beveled . . . outwardly . . . relative to the zero-elevation surface," and the "acute bevel angle" is the specific angular relationship—specifically, an acute angle—between those components. A surface that is "beveled" relative to another surface necessarily forms an angle—a "bevel angle"—and an angle less than 90 degrees is, by definition, acute. StringKing's assertion—that separate written description support for the term "bevel angle" is required (D.I. 63 at 10-13)—makes no sense, because "bevel angle" as claimed describes nothing more than the relationship of the border flange to the zero-elevation surface: it is beveled to form an angle, and that angle is acute.

59.     The '454 Application describes precisely this relationship in terms of a "non-flat" border flange such as a border flange "beveled . . . outwardly . . . relative to the zero-elevation

surface." Ex. 17 ¶ [0050]. The '454 Application's disclosure of a border flange beveled outwardly away relative to the zero-elevation surface therefore provides adequate written description support for a border flange protruding outward (configuration) and protruding outward at a bevel angle (orientation) relative to the zero-elevation surface (reference).

### 2. StringKing's "Shape Versus Orientation" Distinction Lacks Technical Merit

60. StringKing contends that the '454 Application describes only a "shape" of the border flange—a "non-flat cross section" like a "wedged doorstop"—while the '930 Patent claims an "orientation" of how the border flange protrudes away from the zero-elevation surface. D.I. 63 at 11-13. In my opinion, this classification is artificial and unsupported by either the disclosure or the claim language.

61. The '454 Application's "non-flat cross section" does not describe a "shape" in isolation. Rather, it describes a line or surface that is "sloped, beveled or tapered outwardly away (see FIG. 6 bottom) relative to the zero-elevation surface." Ex. 17 ¶ [0050]. With reference to FIG. 6 of the '454 Application, the "166 (slope)" annotation identifies a line or surface that is angled relative to the zero-elevation surface.



*Id.* at FIG. 6 (cropped). That is not a description of a static "shape"—it is a description of a surface's angular relationship to a reference plane, which is precisely what "orientation" means. Notably, the '930 Patent variously claims a border flange protruding outward "at" a bevel angle

relative to a zero-elevation surface, or a border flange edge that "is" beveled by an inclined surface. Ex. 6 at Claims 1-18. An individual "beveled flange" component is neither claimed nor described as a discrete feature in the '930 Patent. The '454 Application describes in consistent fashion that a border flange "may be" beveled outwardly away relative to the zero-elevation surface. Ex. 17 ¶ [0050].

62.     StringKing also asserts that the '930 Patent "introduces the border flange with new wording, saying it is 'angled rearward'" and calls "this angled-rearward orientation a 'bevel.'" D.I. 63 at 11. However, the '930 Patent's statement that the border flange is "angled rearward (away from the picture in FIG. 2)" (Ex. 6 at 7:28-41) is offered solely for perspective with respect to the drawing view—it describes the drawing orientation, not a new characteristic of the border flange itself. The '930 Patent does not introduce a new concept of an "angled rearward" flange; it describes, in words keyed to the perspective of FIG. 2, the same beveled configuration that the '454 Application discloses as "beveled . . . outwardly away . . . relative to the zero-elevation surface." Ex. 6 at 7:28-41; Ex. 17 ¶ [0050].

63.     StringKing further contends that the '930 Patent "adds three new words: 'at a slope'" and that the absence of the phrase "at a slope" in the '454 Application confirms that the '454 Application fails to provide adequate written description support. D.I. 63 at 11-12. However, the words "at a slope" do not appear in any claim of the '930 Patent. The claims recite "at an acute bevel angle"—not "at a slope." Ex. 6 at Claims 1-18. And as I have explained, the '454 Application fully discloses a border flange that is "beveled . . . outwardly away . . . relative to the zero-elevation surface" (*see* Section VI.A.1, *supra*), which is a border flange at a bevel angle relative to the zero-elevation surface. The presence or absence of the specific phrase "at a slope" in the specification is irrelevant to whether the parent application provides written

18

description support for a border flange "protruding outward at an acute bevel angle relative to said zero-elevation surface."

64.    In describing the border flange, the '454 Application uses a patent drafting technique called structured breadth.  The '454 Application states:

> The border flange 166 may be a uniform flat strip but is more preferably non-uniform for maximum flexibility. For example, for maximum flexibility the border flange 166 along at least a portion of the five finger-receiving sections 27, 28, 29, 30 and 31 can include a series of V-notch slits 168. The border flange 166 may also have a non-flat cross section configured to avoid interference between the border flange 166 of adjacent finger-receiving sections 27, 28, 29, 30 and 31. For example, the border flange 166 may be sloped, beveled or tapered outwardly away (see FIG. 6 bottom) from the finger-receiving sections 27, 28, 29, 30, and relative to the zero-elevation surface.

Ex. 17 ¶ [0050]. This description expressly teaches that the border flange may be a uniform flat strip but may also be non-uniform in some embodiments, for example, including a series of V-notch slits or having a non-flat cross section. Regarding the non-flat cross section, the description provides sloped, beveled or tapered outwardly away relative to the zero-elevation surface as examples.

65.    Thus, the '454 Application expressly teaches a border flange that is a uniform flat strip that may include a non-uniform cross section such as a border flange that is sloped, beveled, or tapered relative to the zero-elevation surface. Using the express disclosure of the '454 Application, all a POSITA would have to do to understand a border flange that is beveled outwardly relative to the zero-elevation surface—as described/shown and claimed in the '930 Patent—is start with a uniform flat strip then apply a bevel which defines a bevel angle (an angle that extends to the corner) to the uniform flat strip. Since this configuration is expressly disclosed in the '454 Application, there is no question that the inventors were in possession of the claimed subject matter as of at least the filing date of the '454 Application.

19

**3.      StringKing's Own Comparison Demonstrates That the '454 Application Discloses the Claimed Configuration**

66.    StringKing presents Table T1 comparing the '454 Application's disclosure to the '930 Patent's disclosure. D.I. 63 at 11. In my opinion, this comparison demonstrates the opposite of what StringKing intends: both disclosures describe the same physical configuration.

67.    The '454 Application states: "The border flange 166 may also have a non-flat cross section configured to avoid interference between the border flange 166 of adjacent finger-receiving sections 27, 28, 29, 30 and 31. For example, the border flange 166 may be sloped, beveled or tapered outwardly away (see FIG. 6 bottom) from the finger-receiving sections 27, 28, 29, 30, and relative to the zero-elevation surface." Ex. 17 ¶ [0050].

68.    The '930 Patent states: "Importantly, the border flange 166 surrounding the five finger-receiving sections 27, 28, 29, 30 and 31 is formed with a bevel, e.g., the border flange 166 is angled rearward (away from the picture in FIG. 2). This bevel is configured to avoid interference between the border flange 166 of adjacent finger-receiving sections 28, 29, 30 and 31. Preferably, the border flange 166 is sloped, beveled or tapered away at a slope relative to the zero-elevation surface as shown in FIG. 4 (bottom) around all of the finger-receiving sections 28, 29, 30, 31." Ex. 6 at 7:38-47.

69.    Both disclosures describe the same physical configuration: a border flange that is "beveled" in a direction "outwardly away" or "away" and in a relationship "relative to the zero-elevation surface." The '930 Patent says the border flange is "formed with a bevel" and describes it as "sloped, beveled or tapered away at a slope relative to the zero-elevation surface." Ex. 6 at 7:38-47. The '454 Application says the border flange may be "sloped, beveled or tapered outwardly away . . . relative to the zero-elevation surface." Ex. 17 ¶ [0050]. These are not

20

different configurations—they are different verbal formulations of the same physical arrangement.

| '454 Application | '930 Patent |
|---|---|
| The border flange 166 may also have a non-flat cross section configured to avoid interference between the border flange 166 of adjacent finger-receiving sections 27, 28, 29, 30 and 31. For example, the border flange 166 may be sloped, beveled or tapered outwardly away (see FIG. 6 bottom) from the finger-receiving sections 27, 28, 29, 30, and relative to the zero-elevation surface.<br><br>Ex. 17 ¶ [0050]. | Importantly, the border flange 166 surrounding the five finger-receiving sections 27, 28, 29, 30 and 31 is formed with a bevel, e.g., the border flange 166 is angled rearward (away from the picture in FIG. 2). This bevel is configured to avoid interference between the border flange 166 of adjacent finger-receiving sections 28, 29, 30 and 31. Preferably, the border flange 166 is sloped, beveled or tapered away at a slope relative to the zero-elevation surface as shown in FIG. 4 (bottom) around all of the finger-receiving sections 28, 29, 30, 31.<br><br>Ex. 6 at 7:38-47. |

70.    In my opinion, the different wording discussed above does not introduce in the '930 Patent a border flange or configuration that is different or unsupported by the disclosure in the '454 Application.  I understand that courts have held the written description requirement does not demand verbal identity; it demands that the parent disclosure "reasonably convey[] to the artisan that the inventor had possession at that time of the later claimed subject matter." *In re Kaslow*, 707 F.2d at 1375. In my opinion, the '454 Application's description of a border flange beveled outwardly away relative to the zero-elevation surface reasonably conveys possession of the representative border flange protruding outward from a zero-elevation surface **and** protruding outward at a bevel angle relative to the zero-elevation surface.

### 4.    StringKing's Reliance on FIG. 9 of the '930 Patent Undermines Its Own Position

71.    StringKing asserts that FIG. 9 of the '930 Patent "distinguishes" a border flange with an "downward-angled protrusion" from ones that have a "flat bottom," such as in FIG. 6 of

the '454 Application. D.I. 63 at 13. In my opinion, this argument actually undermines StringKing's position. By acknowledging that FIG. 9 of the '930 Patent contrasts beveled flanges with "flat bottom" flanges, StringKing effectively concedes that the '454 Application's description of a "non-flat" border flange—that is, one that is not flat—describes a flange with the very configuration the '930 Patent claims. A border flange that is described as "non-flat" and "beveled . . . outwardly away . . . relative to the zero-elevation surface" is, by definition, a border flange that protrudes at an angle—and therefore a bevel angle—relative to the zero-elevation surface.

72.     The '930 Patent itself confirms that "formed with a bevel" is a well-known configuration in which one component is angled—that is, forms a bevel angle—relative to another component. Ex. 6 at 7:38-63. The '454 Application similarly describes the configuration of the border flange as "beveled . . . outwardly away . . . relative to the zero-elevation surface." Ex. 17 ¶ [0050]. In both cases, the disclosure describes the same physical relationship: the surface of the border flange that would otherwise be parallel to the zero-elevation surface is replaced with a surface that is angled—that is, beveled—outwardly away, forming an angle relative to the zero-elevation surface. In each case, the border flange configuration is described "relative to the zero-elevation surface" because a beveled relationship requires an angle which requires a reference line.

73.     An acute angle is simply a type of angle—specifically, an angle less than 90 degrees. The '454 Application's disclosure of a border flange "beveled outwardly away relative to the zero-elevation surface" therefore provides adequate written description support for a border flange "protruding outward at an acute bevel angle relative to said zero-elevation surface."

22

**5. StringKing's "Two-Part" Characterization of the Claim Language Is Unsupported**

74.     StringKing contends that the "acute bevel angle" limitation "has two parts: a protruding aspect (orientation, not shape) and a sectioned aspect (one section angled downward, others not)." D.I. 63 at 10. In my opinion, neither a "protruding aspect" distinct from the claimed "protruding outward" nor a "sectioned aspect" is recited by the claims or required by any reasonable interpretation of the specification.

75.     The claims recite a border flange "protruding outward from said zero-elevation surface . . . and protruding outward at an acute bevel angle relative to said zero-elevation surface." Ex. 6 at Claims 1-18. That is the full extent of the claim requirements. The claim language uses the conjunction "and" to connect two descriptions of the same border flange—not to introduce a separate "protruding aspect" distinguishable from the border flange's general protrusion.

76.     StringKing's own Diagram D1 confirms this understanding.



Diagram D1.

D.I. 63 at 10. Diagram D1 shows that the acute bevel angle is simply the angle formed by two surfaces—the border flange and the zero-elevation surface—in a beveled relationship. That is the ordinary meaning of a "bevel" or "beveled" arrangement: an angle formed between two surfaces. The '454 Application discloses exactly this arrangement when it describes a border flange "beveled . . . outwardly away . . . relative to the zero-elevation surface." Ex. 17 ¶ [0050].  In

other words, the acute bevel angle is defined by the border flange configuration relative to the zero-elevation surface and not a feature claimed or described to affirmatively require its own limitations.

### B.    The '454 Application Supports the Full Scope of the Claims

77.    StringKing separately argues that the '454 Application fails to provide adequate written description support for the "full scope" of claims 1 through 18, which recite a border flange protruding at an acute bevel angle around "at least four of said adjacent finger sections." D.I. 63 at 14-16. StringKing contends that the claims are broad enough to encompass a "sectioned" border flange—one in which some sections protrude at an acute bevel angle while others do not—and that the '454 Application does not disclose such a sectioned flange. *Id.*

78.    In my opinion, this argument improperly asks the Court to construe the claims as covering a hypothetical embodiment and then to deny priority because the parent application does not specifically disclose that hypothetical. The '454 Application discloses a border flange surrounding the finger-receiving sections that may be "sloped, beveled or tapered outwardly away . . . from the finger-receiving sections 27, 28, 29, 30." Ex. 17 ¶ [0050]. The claim language "at least four of said adjacent finger sections" defines the minimum extent of the beveled border flange, and the '454 Application discloses a border flange surrounding the finger-receiving sections with this orientation. This is sufficient to support the claimed scope.

79.    Written description analysis looks to "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (citations omitted). The '454 Application's description of a border flange surrounding the finger sections with a sloped, beveled, or tapered orientation satisfies that standard.

C.      **Claim 19 Is Supported by the '454 Application**

80.      StringKing also argues that claim 19's "border flange edge" limitation is not supported by the '454 Application. D.I. 63 at 16. However, the '454 Application's disclosure of a border flange with dimension and orientation characteristics provides adequate support for the limitations of claim 19. The '454 Application describes the border flange as having specific width ranges and configurations relative to the zero-elevation surface (Ex. 17 ¶ [0050]), which adequately conveys the concept of a border flange edge that is beveled by an inclined surface sloping away from the zero-elevation surface.

D.      **The Prosecution History Confirms That the Applicant Contested the Examiner's Written Description Rejections**

81.      In addition to the substantive analysis of the '454 Application's disclosure, I have reviewed the prosecution history of the '454 Application and note that the Applicant did not silently acquiesce to the Examiner's written description rejections. Rather, the Applicant substantively contested the Examiner's new matter findings on multiple occasions.

82.      In the Second Reply (August 4, 2021 response to May 4, 2021 non-final Office Action), the Applicant specifically argued that "a mere change in semantics from 'border' to 'border flange' is not new matter where a 'flange' is defined as a 'projecting rim' and the ['915 Application] describes a border surrounding dorsal panel and projecting 'within a range of from 4-8 mm across, and most preferably a 5-6 mm margin.'" Ex. 13 at 11.

83.      In the Reply to Final (January 25, 2022 response to August 25, 2021 final Office Action), the Applicant mounted a comprehensive defense, citing five Federal Circuit decisions and providing point-by-point responses to each new matter contention. The Applicant explained that "the drawings and description of the parent application relied upon fully articulate what [the border flange] is in all physical respects, and fully enable practice of the present invention[, and]

25

'reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter.'" Ex. 15 at 6-11 (quoting *Kaslow*, 707 F.2d at 1375). The Applicant further noted that "[t]he exact terms need not be used" and "[t]he disclosure as originally filed does not have to provide in haec verba support for the claimed subject matter at issue." Ex. 15 at 7 (citing *Eiselstein*, 52 F.3d at 1038; *Crown Operations*, 289 F.3d at 1376; *Kaslow*, 707 F.2d at 1375; *Ralston Purina*, 772 F.2d at 1575; and *Vas-Cath*, 935 F.2d at 1563).

84.     In my opinion, this prosecution history is consistent with, and further supports, the conclusion that a POSITA reading the '454 Application would understand the inventor to have been in possession of the subject matter claimed in the '930 Patent. The Applicant's substantive arguments during prosecution demonstrate that the inventor and the inventor's representatives understood the '454 Application to provide written description support for the border flange limitations now at issue.

85.     During prosecution of the '454 Application—the parent application to the '930 Patent—Applicant did not "acquiesce" to any rejections or assertions that a "border flange" was not supported by the '454 Application's parent, the '915 Application. In fact, Applicant maintained that the '915 Application did support the "border flange" as claimed in the '454 Application and repeatedly argued that the "border flange" was entitled to the priority date of the '915 Application, in response to assertions and rejections under Section112 through three rounds of Office Actions and Replies.  Only after an Advisory Action indicated that the claims were not in condition for allowance and further consideration would be required did Applicant allow the application to go abandoned.  *See* Section V.C, *supra*. In other words, Applicant did not acquiesce to any assertion or rejection that a "border flange" in the '454 Application claims was not supported by the '915 Application.

26

86.     Applicant changed the priority relationship between the '454 Application and its parent, the '915 Application, from continuation to CIP, based on a different feature—the "slits" limitation of claim 21—that the Examiner asserted (and the Applicant did not disagree) was not supported by the '915 Application. Ex. 15 at 7, 10. In other words, Applicant did not file a CIP application instead of replying to an assertion or rejection regarding a lack of support for a "border flange."  Applicant merely changed the priority relationship (from CON to CIP) between the '454 Application and its parent, the '915 Application, to comply with PTO Rules in view of a limitation (the "slits" limitation of claim 21) unrelated to the "border flange" limitation and while vigorously arguing that the "border flange" feature was supported.  *See* Ex. 15 at 6-11. Applicant also amended the '454 Application claims to eliminate "flange" and "remove any lingering doubt" as to whether the '454 Application claims were supported by the '915 Application. *Id.* at 7.

87.     Applicant filed the '152 Application as a CIP to the '454 Application on February 25, 2022 (Ex. 6 at 1), but not to add a "border flange" or otherwise address any assertion or rejection that a "border flange" was not supported in the '454 Application.  The "border flange" is indisputably supported by the '454 Application (*see* Section VI.A, *supra*) and the argument was whether it was entitled to priority to the '915 Application.  Here, STX is seeking priority only to the '454 Application, so whether the border flange finds support in the '915 Application is irrelevant.

88.     The Examiner's assertion  and rejections during prosecution of the '454 Application, based on the '915 Application allegedly not supporting the "border flange" as claimed in the '454 Application, has no relevance to the '930 Patent because "acquiescence estoppel" implicitly operates (if at all in the case of Section 112 written description rejections) to

preclude an Applicant from arguing that a claimed feature is supported in the written description of the application in which it is claimed or to which it claims priority (e.g., as a continuation), if an Applicant previously acquiesced to the rejection and filed a CIP application including the feature.

89.    In other words, whether acquiescence estoppel applies at all with respect to written description, it does not apply in a child application (such as the '930 Patent) that was not filed out of acquiescence to a Section 112 rejection or in which no such rejections were made, or prevent the Applicant in the child application from arguing that claim terms in the child application are supported and/or entitled to the priority of a parent application.

**E.    StringKing's Apparent Claim Construction of "Relative to the Zero-Elevation Surface" Is Incorrect**

90.    StringKing apparently argues that the phrase "relative to said zero-elevation surface" in the claimed "protruding outward at an acute bevel angle relative to said zero-elevation surface" refers to the bottom surface of the flange, which may be in some disclosed embodiments adjacent to "the zero-elevation surface," for example as demonstrated by StringKing's Diagrams D1-D3, in which StringKing's annotations identify the "flat" bottom surface of the border flange as the portion forming a bevel angle relative to the zero-elevation surface. D.I. 63 at 8-13. In my opinion, based on the specification of the '930 Patent, any suggested or implied interpretation that "relative to the zero-elevation surface" relates only to the bottom surface of the border flange is incorrect.

91.    The first use of the term "relative to the zero-elevation surface" in the specification of the '930 Patent describes the border flange 166 as "sloped, beveled or tapered away at a slope relative to the zero-elevation surface." '930 Patent at 7:44-47.

92.      Applying this analysis, the language in the '930 Patent specification ("Preferably, the border flange 166 is sloped, beveled or tapered away at a slope relative to the zero-elevation surface as shown in FIG. 4 (bottom)."), is consistent with the '454 Application description discussed above.

**VII.    CONCLUSION**

93.      Based on my review of the materials identified above and my experience in patent law and the evaluation of written description issues under 35 U.S.C. § 112(a), it is my opinion that the '454 Application provides adequate written description support for the claims of the '930 Patent, including the border flange limitations recited in claims 1 through 19.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Michael S. Lee

Executed on April 24, 2026

29